STATE of Minnesota, Respondent,

v.

Kenneth James BUDREAU, Appellant.

No. C0–01–112.

Supreme Court of Minnesota.

April 18, 2002.

John M. Stuart, Minnesota State Public Defender, Theodora Gaitas, Assistant State Public Defender, Minneapolis, MN, Attorneys for Appellant.

Kenneth James Budreau, North Stillwater, MN, Pro Se.

Mike Hatch, Minnesota Attorney General, Thomas R. Ragatz, Assistant Attorney General, St. Paul, MN, Alan L. Mitchell, St. Louis County Attorney, Duluth, MN, Attorneys for Respondent.

## OPINION

PAUL H. ANDERSON, Justice.

A St. Louis County jury found appellant Kenneth James Budreau guilty of first-

degree premeditated murder and first-degree murder while committing kidnapping. The district court then convicted Budreau of both counts and sentenced him to life imprisonment without possibility of release on the conviction for murder while committing kidnapping. On direct appeal as a matter of right, Budreau alleges that his conviction should be reversed for the following reasons: (1) he was deprived of his right to a fair trial by references at trial to his possible involvement in another homicide; and (2) there was insufficient evidence for the jury to find he committed a kidnapping. We affirm.

On March 14, 1999, the body of Faye Annette Wennell was discovered at a construction site near the shore of Lake Superior in Duluth, Minnesota. Wennell's body had sustained multiple blunt trauma injuries and several stab wounds. The blunt trauma injuries covered Wennell's scalp, face, torso, arms, and legs, and stab wounds were found in Wennell's scalp, face, and neck. Dr. Michael McGee, the medical examiner, determined the cause of death as exsanguination resulting from the blunt trauma injuries and stab wounds. Following an investigation, the police arrested three suspects for Wennell's murder: Daniel Deegan, Stacey Mullen, and appellant James Budreau. The St. Louis County grand jury indicted all three suspects for first-degree murder.

Mullen pleaded guilty to second-degree murder and kidnapping and subsequently testified at Budreau's trial. In her testimony, Mullen described what happened on the evening of March 13, 1999, and the early morning hours of March 14. Budreau, Deegan, Mullen, and Wennell were all present at the Red Lion Bar in Duluth. Mullen and Deegan knew each other and had planned to meet at the bar that eve-ning. They were already there when Wennell arrived. Mullen recognized Wennell because the two women had recently been in the county jail together. Wennell approached Mullen at some point in the evening and bought her a beer. Mullen believed Wennell had some money and asked Wennell if she would be interested in buying some crack cocaine together. Mullen testified that she had attempted to purchase some crack cocaine herself earlier that evening, but had been unsuccessful and lost her money in the attempt.

Following this conversation, Wennell left Mullen to socialize with other persons at the bar, while Mullen introduced herself to Budreau, whom she recognized but did not know. The two then discussed a way to have Wennell buy crack cocaine for them. They next approached Deegan to join them in their scheme because he had a car. Because Mullen knew that Wennell "liked women," the plan was that Mullen would drink beer and flirt with Wennell, and then the group would leave the bar together to buy drugs.

At some point after Mullen, Deegan, and Budreau made their plan and when all the parties were still at the bar, Wennell and Budreau had an argument. Mullen did not hear the argument and did not know what the two argued about, but after the argument, Budreau told Mullen "I'm going to get that bitch." Despite the argument and Budreau's comment, Mullen continued with her part of the plan by sitting with Wennell at the bar. At closing time, Mullen invited Wennell to leave the bar with her, stating that they were "going to go get high." Deegan left the bar first, followed by Mullen and Wennell. Budreau left last, but before he left the bar he picked up a pool cue and brought it with him.

The four left the bar through the back door and got into a car owned by Deegan's girlfriend. Deegan drove the car, with Budreau seated in the front passenger seat and the two women in the back seat, with Wennell sitting behind Budreau. Deegan first drove to the apartment where Mullen had been staying, and Mullen went into the apartment to get some stolen clothing that she planned to exchange for drugs. On her return to the car, Mullen testified that she expected Deegan to drive toward a certain neighborhood where drugs could be bought, but instead Deegan drove in the opposite direction toward Lake Superior. Mullen asked where they were going and Deegan told her to keep her mouth shut. Wennell then asked Mullen where they were headed, and Mullen said she did not know. Wennell again asked where they were going, and, according to Mullen, Budreau responded, "We're going to take you down here and kill you." Mullen testified that neither woman took Budreau seriously—they both laughed it off and Wennell said, "[y]eah right."

Deegan stopped the car near Lake Superior, and Budreau turned around and punched Wennell in the face with his fist multiple times. Budreau then got out of the front seat of the car, opened Wennell's door, and continued hitting her while she was still in the car. Deegan locked the car doors after Budreau got out of the car, and Mullen yelled at Deegan to open the door, which Deegan eventually did. At some point during the assault, Wennell grabbed Budreau by his hair and fought back. Deegan also began hitting Wennell, and then held her face and arms down. Mullen observed that during the time when Wennell was fighting back, Budreau was hitting Wennell with his fist as well as a broken pool cue. Mullen also stated that she got into the front seat of the car and

reached into Wennell's pocket and grabbed her money.

While the two men continued to assault Wennell, Mullen walked behind the car and urinated. When she returned, Mullen saw that Wennell was now on the ground next to the car. Mullen testified that she observed Budreau kicking Wennell and stomping on her head. According to Mullen, Budreau said "[w]e all have to be a part of this" and instructed Mullen to kick Wennell's head. Mullen complied and kicked Wennell, but Budreau objected, saying "[n]ot like that, like this," demonstrating by stomping on Wennell's head. Mullen admitted that she then stomped on Wennell's head. Budreau also continued kicking Wennell. Mullen next observed Budreau hitting Wennell with a big sharp object, later identified as a fence post. At this point, Deegan turned the car headlights off because he did not want to be seen from the nearby freeway. Mullen stated that she did not know how the assault ended. She testified that she, Deegan, and Budreau eventually got into the car and drove away. After driving a short distance, Budreau said they had to drive back to get Wennell's jacket, "because my hair is all over that jacket."

On returning to the place where they had left Wennell's body, all three got out of the car. Mullen noted that Wennell was breathing and making a gurgling sound. Deegan went over to Wennell and removed her shoes, Budreau took her jacket, and Mullen, following Budreau's instruction, cleaned under Wennell's fingernails. Budreau then told Mullen to turn around, and as she complied with his direction she saw Budreau lean over Wennell, but she did not see what he did. After that, the gurgling sound Wennell had been making stopped.

Budreau, Mullen, and Deegan then drove approximately five minutes to the home of Budreau's sister Penny Budreau. Penny Budreau, her boyfriend Gregory Wind, and Penny Budreau's daughter were at home and awake when the three arrived. On entering the home, Budreau immediately went into the bathroom while Mullen and Deegan stayed in the front room with Wind and Penny Budreau. Penny Budreau asked Mullen about the "red stuff" on her pants and shoes. Mullen told Penny Budreau it was paint, but Budreau came out of the bathroom and interrupted, stating they had hit a deer. Mullen was holding Wennell's jacket, which was dripping with blood, and someone gave her a plastic bag for the jacket. At some point, Mullen followed Budreau into the bathroom where he was washing blood off his shoes. Penny Budreau also came into the bathroom, became very upset, and asked the group to leave her home. Mullen testified that she and Deegan left together in Deegan's car, and that Budreau was still in Penny Budreau's home when they drove away.

Penny Budreau and Wind testified at trial. They stated that they spent the evening of Wennell's murder with Budreau at a casino in Duluth. Late in the evening, Budreau decided to walk to the Red Lion Bar for a drink before the bar closed, planning to return to the casino so that the three could drive to Penny Budreau's home together. When Budreau did not return to the casino, Penny Budreau and Wind drove home. Penny Budreau and Wind both testified that at approximately 3:00 a.m. on March 14, Mullen, Deegan, and Budreau arrived at their home. Their testimony corroborated Mullen's testimony regarding the events at Penny Budreau's home.

James Thibault, a prisoner with Budreau at the St. Louis County jail in March 1999, also testified. Thibault testified that he and Budreau talked about their cases, and that Budreau told him about Wennell's murder. Thibault testified that Budreau stated he "stuck the bitch in the throat" with a knife, broke a pool cue the night of the murder, and hit Wennell in the head with a fence post. Dr. McGee, the medical examiner, also testified at trial. He stated that Wennell had numerous injuries, including stab wounds, bruising consistent with having been caused by part of a pool cue, and other injuries consistent with having been caused by a fence post.

Physical evidence presented at trial included part of a pool cue found behind a gas station, which fit together with the broken end of a pool cue found at the Red Lion Bar and with pieces found at the crime scene. A DNA expert also testified at trial. DNA testing matched Wennell's blood with the blood on the pool cue piece found behind the gas station. The car driven by Deegan on the night of Wennell's murder was recovered, and DNA testing matched Wennell's blood with blood samples found in the car. DNA testing also matched hairs found in the back seat of the car with Wennell's hair. Finally, DNA testing confirmed that a hair found on Wennell's hand matched Budreau's DNA profile. The expert testified that Budreau's DNA profile would not be expected to occur more than once among unrelated individuals in the world population.

Budreau elected not to testify at trial and presented only one witness, Margaret Campbell, who testified that Budreau was staying with her in March 1999. Campbell stated that on the night of March 13, 1999, she went to bed after 11:00 p.m. and that at some point she was awakened by knock-

ing on the door, which she did not answer. Later in the night, she was awakened by Budreau throwing rocks at her window. He had forgotten his keys so she let him in. Campbell testified that she thought the time was around 1:00 a.m., but also stated that she was "just kind of guessing." Campbell testified that she noticed nothing unusual about Budreau's appearance except that he appeared to have been drinking, but that he did not look like he had been in a fight. Campbell testified that the first thing Budreau said to her was that he needed to talk to her boyfriend, Eric Williams, because "[s]omething bad happened." Campbell refused to wake Williams up. She then talked with Budreau while he drank a beer, but she did not ask about the bad thing that happened.

Four statements were made by witnesses at the trial referencing Budreau's possible involvement in another homicide. First, Wind testified that when Budreau, Mullen, and Deegan came to the home at approximately 3:00 a.m. on the morning of the murder, Budreau "said there was another body." Wind stated that he did not ask Budreau any questions on hearing this statement. Budreau did not object to this statement at trial, and he did not ask for it to be struck from the record.

The other three statements which Budreau challenges were made by Mullen. Mullen testified that during the assault, Budreau told her she had to participate in kicking Wennell. She stated that Budreau said:

'You know how we do this?' Um, he said he already killed a man. He said, 'I already killed a man.'

Budreau objected to this statement and the district court sustained Budreau's ob-

jection and instructed the jury to disregard the statement. Later in her testimony, Mullen stated:

[Penny Budreau] was all right when we first got there, but once she seen the blood, she just got kind of hysterical. Wanted us to get out of the house, but didn't want Ken [Budreau] to leave. Didn't want him to come with us. And that's when he was trying—Ken was trying to calm her down. And that's when he said that I did it. He said, *"She just killed a woman and I killed a man."*

\* \* \* \*

\* \* \* *"And the bodies are hid."*

Budreau objected to the statement, and the court sustained the objection and ordered the jury to disregard the testimony. The court also gave the jury a detailed cautionary instruction following a bench conference.

Finally, Mullen testified that she met with Budreau the day after the murder, and that he told her not to worry and to stop looking so scared. She also stated: "He told me that everything was going to be all right. That this wasn't the first time." Mullen did not explain what Budreau meant by this statement. Budreau did not object to this testimony.

On October 11, 2000, a jury found Budreau guilty of both counts of first-degree murder—premeditated murder under Minn.Stat. § 169.185, subd. 1, and murder while committing kidnapping under Minn. Stat. § 609.185, subd. 3. The district court convicted Budreau on both counts. Over Budreau's objection, the court sentenced him for first-degree murder while committing kidnapping, imposing the mandatory sentence of life imprisonment without possibility of release. *See* Minn.Stat.

§ 609.106, subd. 2 (1998). On appeal, Budreau argues he is entitled to a new trial because: (1) four statements at trial referencing his possible involvement in another homicide deprived him of his right to a fair trial; and (2) there was insufficient evidence to support the jury's verdict of guilty of murder while committing a kidnapping.

I.

Budreau asserts he should be granted a new trial because of four witness statements made during his trial referencing his possible involvement in another homicide. Budreau contends that the statements were *Spreigl* evidence inadmissible under Minn. R. Evid. 404(b). He also contends that the statements were inadmissible under Minn. R. Evid. 403 because the probative value of the statements was substantially outweighed by the danger of unfair prejudice. In essence, Budreau argues that the jury's exposure to repeated references to his involvement in another homicide deprived him of his due process right to a fair trial.

At trial, Budreau objected to two of the four statements that he now asserts are prejudicial. These two statements were "I already killed a man" and "She just killed a woman and I killed a man." Budreau's two objections were sustained. The district court then ordered the statements struck from the record and instructed the jury to disregard each statement.[1] Budreau did not object to the court's cautionary instructions at trial, nor did he argue that the instructions were inadequate or request a mistrial. The other two witness statements referencing Budreau's involvement in another homicide were "there was another body" and "this wasn't the first time." At trial Budreau did not object to either statement, and so they became part of the record. Because the first two statements were struck from the record and the second two statements were not objected to, the primary question on appeal is whether the court erred in admitting the statements or in giving proper curative instructions.

▮▮▮ We review Budreau's argument with respect to the four statements alleged to be prejudicial for plain error affecting substantial rights. A reviewing court has the discretion to consider an unobjected-to error on appeal if it is plain error affecting substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 & n. 7 (Minn.1998) (citing Minn. R.Crim. P. 31.02). For there to be plain error, there must be: (1) error; (2) that is plain; and (3) the error must have affected substantial rights. *Id.* at 740. When these three prongs are met, a reviewing court "then assesses whether it

---

1. After Budreau's first objection, the district court sustained the objection and stated: "The last portion of her answer will be stricken. The jury is instructed to disregard." After the second objection, the court gave a similar instruction, and then, following a bench conference, gave the following instruction:

Number 1, there is no evidence of any kind to suggest that Kenneth Budreau has been involved in any killing of a man. You have heard some reference in Ms. Mullen's testimony to that.

Number 2, there's no evidence of any death of any man during this immediate or relevant time period.

Number 3, there has never been any allegation or any evidence to suggest that Kenneth Budreau was involved in any homicide prior to March 13th or March 14th or since that date.

And you are specifically instructed to disregard any testimony to the contrary from this witness or any other witness, okay?

should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.*

■ Under a plain error analysis, we first determine whether error occurred. Here, Budreau objected to two of the four statements heard by the jury; following Budreau's objections to these statements, the court ordered the statements struck from the record and gave the jury a cautionary instruction after each objection. Budreau contends that the prejudicial effect of the statements could not be overcome by the court's cautionary instructions. In support, Budreau cites *State v. Caldwell,* in which we acknowledged the futility of cautionary instructions in some cases. 322 N.W.2d 574, 590–91 (Minn. 1982). But we presume that jurors follow the court's instructions. *State v. Shoen,* 578 N.W.2d 708, 718 (Minn.1998); *see also Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

It was not error for the district court to sustain Budreau's objections and give the cautionary instructions. After the two statements were each struck from the record and the cautionary instructions given, the statements were not highlighted or referred to in any way, either by the state or through witness statements. Nothing indicates that the jury did not follow the court's instructions or otherwise considered testimony that was not properly before it. We conclude that there was no error when the court struck the two statements from the record, and that the court's cautionary instructions cured any prejudicial effect. Accordingly, we are not required to inquire further into the impact of these statements. *See Griller,* 583 N.W.2d at 740 (stating that before appellate court should engage in plain error analysis, it must first detect an error and that error must be plain).

■ The other two statements admitted without objection also fail the first prong of the plain error analysis. The statements were "there's another body" and "this wasn't the first time." The statements were brief, lacking in detail, and present only an imprecise suggestion of any prior bad acts by Budreau. The fact that the statements were never referred to again further supports our determination that it was not error to admit these unobjected—to statements at trial. *See State v. Ferguson,* 581 N.W.2d 824, 833 (Minn. 1998) (stating that this court looks to manner in which improperly admitted evidence was presented and whether the evidence was used in closing argument).

■ Budreau emphasizes, and we agree, that "[s]trong evidence of guilt does not—cannot—deprive a defendant of the right to a fair trial." *State v. Harris,* 521 N.W.2d 348, 355 (Minn.1994). Yet even if we had determined that the district court erred, which we do not, such a determination does not automatically result in a reversal of Budreau's conviction and granting of a new trial. In order to satisfy the third prong of the plain error test, the defendant bears the heavy burden of showing that the error affected substantial rights. *Griller,* 583 N.W.2d at 741. A plain error affects substantial rights if the error was prejudicial and affected the outcome of the case. *Id.* & n. 14 (citing *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). An error is prejudicial if there is a "reasonable likelihood the error had a significant· effect on the verdict." *State v. Patterson,* 587 N.W.2d 45, 52 (Minn.1998) (quoting *Griller,* 583 N.W.2d at 740).

■ Strong evidence of a defendant's guilt for the charged crime can support the

conclusion that the jury rested its verdict on properly admitted evidence and that it was unlikely that the error had a significant effect on the verdict. *See id.* Here, we look to the record as a whole when making our analysis. The four statements referencing Budreau's involvement in another homicide were brief and lacking in detail. In fact, two of the four statements, the unobjected-to statements, were ambiguous and nonspecific. In contrast, the evidence supporting Budreau's culpability for Wennell's murder is specific, detailed, and well-corroborated. Mullen, Budreau's accomplice and an eyewitness to the murder, testified against Budreau. Mullen's unrebutted testimony established that, while at the bar, Budreau said, "I'm going to get that bitch," and he made a plan with Mullen and Deegan to have Wennell leave the bar with them under the ruse of "going to go get high." He took a pool cue with him when he left the bar. Then, while in the car, Budreau stated, "We're going to take you down here and kill you." Mullen also testified that Budreau hit Wennell in the face while he was in the car and that he continued hitting her from a position outside the car. Mullen further testified that at some point Wennell moved or was removed from the car to the ground outside the car, that Budreau continued kicking her, and also that Budreau hit her repeatedly with a broken pool cue and a fence post.

Mullen also testified that she, Budreau, and Deegan left the scene of the assault, that at Budreau's insistence they drove back to Wennell's body and took Wennell's jacket and shoes, and that Mullen cleaned underneath Wennell's fingernails at Budreau's insistence. According to Mullen, Wennell was breathing and making a gurgling sound when they returned, but the gurgling sound stopped after Budreau leaned over Wennell.

Penny Budreau and Gregory Wind testified that Budreau, Mullen, and Deegan came to their home at 3:00 a.m. the morning of Wennell's murder, covered in blood and carrying a bloody jacket. Wennell's body was found without a jacket or shoes. James Thibault, who was in the St. Louis County jail with Budreau, testified that he had several conversations with Budreau about Budreau's case and that Budreau stated that "he stuck the bitch in the throat," and hit her in the head with a fence post.

Budreau's alibi for the time of Wennell's murder was refuted multiple times at trial. Penny Budreau and Wind testified that Budreau spent the evening of the murder with them at a casino two blocks from the Red Lion Bar, and that Budreau left them to go to "last call" at the Red Lion Bar. Mullen also testified that Budreau was at the bar at closing time, around 1:00 a.m. In fact, Budreau's alibi witness, Margaret Campbell, conceded that she was "just kind of guessing" that Budreau arrived at her home around 1:00 that morning. Finally, DNA testing matched a hair found on Wennell's hand with Budreau's DNA profile, further refuting Budreau's defense that he was not present at Wennell's murder.

The combined effect of this evidence supports the jury verdict of guilty. Any prejudice resulting from the four statements at trial referencing Budreau's possible involvement in another homicide was minimized, first because two of the four statements were ambiguous and nonspecific, and second because the district court ordered the other two statements struck from the record and directed the jury to disregard them. In contrast, the evidence implicating Budreau in Wennell's murder is specific, detailed, and corroborated. Ac-

cordingly, we conclude that the record demonstrates there is no reasonable likelihood that the four statements significantly affected the jury's verdict.

At this point, we note that Budreau's argument focuses on review of the four statements under a harmless error analysis. He makes this argument despite the fact that (1) the two objected—to statements were followed by unobjected—to curative jury instructions, and (2) the other two statements were unobjected to. In essence, by failing to make proper objections, Budreau has waived what could provide the grounds that lead to a harmless error analysis. Nonetheless, Budreau argues that even if the admission of each statement standing alone was not error, the cumulative prejudicial effect of the admission of the four statements was error. We disagree. Further, even if we were to conclude that there was error and that objections to any error were not waived, a harmless error analysis does not lead to the conclusion that Budreau is entitled to a new trial.

Budreau is entitled to a new trial only if the admission of the statements was not harmless beyond a reasonable doubt. *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997). In applying harmless error impact analysis, we ask, "What effect did the jury's hearing [these statements] actually have on the guilty verdict rendered?," *id.*, and whether the verdict was "surely unattributable" to the error. *Id.* (quoting *State v. Jones*, 556 N.W.2d 903, 910 (Minn. 1996)). As stated above, the two statements admitted into evidence were ambiguous and nonspecific, and the other two statements were struck from the record and the jury was instructed to disregard those statements. We conclude that the verdict rendered was surely unattributable

to any error that may have occurred from the jury's exposure to the four statements referencing Budreau's involvement in another homicide.

Our conclusion that Budreau is not entitled to a new trial due to references to his possible involvement in another homicide is not inconsistent with *State v. Olson*, on which Budreau also relies. 279 Minn. 166, 156 N.W.2d 89 (1968). In *Olson*, the court, using a harmless error analysis, granted a new trial because a police officer testified that the defendant had said "he was mixed up in something like this before * * *." *Id.* at 168, 156 N.W.2d at 90. The state later cross-examined the defendant on the prior conviction in a manner that the court concluded was intended to "suggest to a local jury that [their] * * * community would be more secure if defendant was convicted regardless of whether he was guilty of the [charged] crime." *Id.* at 169, 156 N.W.2d at 91. The case at hand differs from *Olson* in several respects.

First, in *Olson* the court found the evidence supporting the verdict "was sufficiently marginal" to require careful examination of alleged errors at trial. *Id.* at 166, 156 N.W.2d at 90. In contrast, the evidence supporting Budreau's conviction is overwhelming. Further, the state in *Olson* deliberately highlighted the initial prejudicial statement, compounding the initial error for an improper purpose. *See id.* at 167–69, 156 N.W.2d at 90–91. Here, no evidence suggests, nor does Budreau allege, that the state or its witnesses improperly sought to elicit the four statements. Indeed, the record suggests that the statements came into the case by inadvertence and the inexperience of the witnesses, not through deliberate effort by the state. A further distinction is that Olson made the statement to a police offi-

cer, *id.* at 168, 156 N.W.2d at 90, while Budreau made three of the four statements during the murder or shortly thereafter. On these facts, we conclude that *Olson* does not support Budreau's request for a new trial.

In sum, the jury's exposure to the four statements did not deprive Budreau of a fair trial. We hold that no plain error occurred, but even if plain error did occur, then the error did not affect substantial rights and does not provide grounds for reversal. Further, we hold that Budreau was not prejudiced by the cumulative effect of the admission of the four statements.

## II.

Budreau also challenges the sufficiency of the evidence. He asserts that, on the charge of murder while committing kidnapping, the state produced insufficient evidence that a kidnapping occurred during the course of events leading to Wennell's death. We disagree.

■■■ In analyzing a challenge to the sufficiency of the evidence supporting a conviction, a reviewing court looks at the record "to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989). In doing so, a reviewing court must recognize that "all inconsistencies in the evidence are * * * resolved in favor of the state." *State v. Bergeron,* 452 N.W.2d 918, 924 (Minn. 1990). A jury's verdict will be upheld under this standard if, giving due regard to the presumption of innocence and to the state's burden of proving guilt beyond a reasonable doubt, the jury could reason-

ably have found the defendant guilty. *See, e.g., State v. Johnson,* 568 N.W.2d 426, 435 (Minn.1997); *State v. Norgaard,* 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965).

■■■ A person is guilty of kidnapping if he "confines or removes from one place to another, any person without the person's consent" for any of the purposes enumerated by the statute, including "[t]o facilitate commission of any felony or flight" or "[t]o commit great bodily harm or to terrorize the victim or another * * *." Minn. Stat. § 609.25, subd. 1 (2000). In Minnesota, there is no requirement that the person be detained for a "substantial" period of time or transported a "substantial" distance. *See State v. Morris,* 281 Minn. 119, 122–23, 160 N.W.2d 715, 717–18 (1968) (holding that limited confinement or removal of a short distance can constitute kidnapping).

In *State v. Crocker,* we expressed our concern that a kidnapping conviction based on minimal acts of confinement or removal might result in a particularly harsh sentence. 409 N.W.2d 840, 845 (Minn.1987). We noted that when *Morris* was decided, a separate sentence for kidnapping was not imposed on the defendant. *Id.* We went on to note that when the legislature amended Minn.Stat. § 609.035 to allow a separate sentence for kidnapping, the effect of that amendment was limited because sentences were presumptively concurrent and the defendant received only one criminal history point for the combined offenses. *Id.* In part, because of the minimal practical effect a kidnapping conviction would have on a defendant's sentence, we declined to reevaluate the holding from *Morris* that a kidnapping conviction could be based on limited restraint or confinement. *Id.* However, in *Crocker* we expressed concern about "un-

fair exaggeration of the criminality of a defendant's conduct in those cases where the confinement was *completely incidental* to the crime committed during the course of the kidnapping." *Id.* (emphasis added).

In 1998 the legislature passed a new provision for heinous crimes. Minn.Stat. § 609.106, subd. 2. The statute now requires a mandatory sentence of life imprisonment without possibility of release for certain convictions, including a conviction for first-degree murder in the course of a kidnapping. *Id.* at subd. 2(2). This is the provision of the statute under which Budreau was sentenced to life imprisonment without possibility of release. We recognize there is now a significantly different implication to a kidnapping conviction. Under the analysis in *Crocker*, the effect of the 1998 legislation on Budreau's sentence provides a basis on which we might reevaluate our holdings in *Morris* and *Crocker*. *See Crocker*, 409 N.W.2d at 845. However, we conclude that under the circumstances of this case there is no such basis to reevaluate our prior decisions. While we remain concerned about the possibility of unfair exaggeration of the criminality of a defendant's conduct, the evidence in this case does not raise such concerns.

The evidence establishes, and the state concedes, that Wennell voluntarily consented to leave the bar with Mullen, Deegan, and Budreau in Deegan's car. Nonetheless, the evidence also indicates that Budreau, Deegan, and Mullen misrepresented their intentions to buy drugs with Wennell in order to deceive Wennell and to obtain her agreement to come with them. Mullen testified that she and Budreau planned that Mullen would drink beer and flirt with Wennell, that they enlisted Deegan into their plan because Deegan had a car, and that they planned to leave the bar together with Wennell.

While Mullen's testimony suggests she may not have intended anything other than buying drugs or perhaps robbing Wennell, her testimony indicates that Budreau and Deegan planned something more. Specifically, Mullen testified that Budreau argued with Wennell at the bar and later told Mullen, "I'm going to get that bitch." Mullen also testified that on leaving the bar Budreau took a pool cue with him.

The evidence also established that the group did not drive to where Wennell had agreed to go, that is, to buy drugs. Instead, Deegan drove to a construction site away from the neighborhood where drugs were sold. While in the car, Deegan told Mullen to keep her mouth shut when Mullen asked where they were going and when Wennell asked the same question, Budreau stated, "We're going to take you down here and kill you."

We conclude that Budreau's conduct did not involve only minimal acts of confinement or removal, nor were his actions "completely incidental" to the murder committed in the course of the kidnapping. There is sufficient evidence in this record to support the guilty verdict on murder while committing a kidnapping. Based on this evidence, we conclude that the jury reasonably could have found that Budreau and his accomplices removed Wennell from the Red Lion Bar to the construction site where the murder occurred. Although no force or threat of force was used to remove Wennell from the bar, the testimony shows that Wennell only consented to go to a place where they could buy drugs, but did not consent to be taken to the isolated construction site where the assault and murder occurred.

Affirmed.