Quanartis DaLee TURNAGE,
Appellant,

v.

STATE of Minnesota, Respondent.

No. A04–2419.

Supreme Court of Minnesota.

Jan. 26, 2006.

John M. Stuart, State Public Defender, Michael F. Cromett, Asst. State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General—Criminal, St. Paul, MN; and James Backstrom, Dakota County Attorney, Nicole E. Nee, Assistant County Attorney, Hastings, MN, for Respondent.

## OPINION

HANSON, Justice.

Appellant Quanartis DaLee Turnage was convicted of two counts of first-degree murder (intentional murder during a kidnapping and premeditated murder) and one count of intentional second-degree murder in connection with the death of Wa Vang on March 2, 2004. The district court sentenced Turnage to life in prison without the possibility of parole on the murder during kidnapping conviction. Turnage appeals his convictions and sentence, arguing that (1) the district court erred in admitting a tape recording of phone calls made by Turnage from the Ramsey County Workhouse; (2) the evidence was insufficient to sustain the conviction because the accomplice testimony was not corroborated and the evidence of kidnapping showed only incidental confinement and

removal of the victim; and (3) the district court erred in failing to instruct the jury that kidnapping requires that any confinement or removal be more than incidental to the underlying crime. We affirm.

Prior to his death, Vang lived at 754 University Avenue, St. Paul, a building that was owned by May Pa Lee and comanaged by Lee's boyfriend, Yia Xiong Yang. Vang assisted Yang in various capacities, including acting as Yang's translator when requested.

Lee also owned a duplex property at 834 University Avenue, St. Paul, a building that has a three-bedroom apartment on the second floor. On January 1, 2004, three couples, Turnage and Tamika Chapman, Turnage's brother Quantez and Lautusia Ball, and Turnage's sister Nicole and Damien Robinson, moved into the second-floor apartment. Nicole and Robinson gave Lee and Yang $1,000 as a deposit for their share of the rent.

After about 2 weeks, Nicole and Robinson moved out of the apartment, and Yang gave them about $550 back. According to Nicole, Yang also promised to give them another $100. On March 2, 2004, Nicole, Robinson, Quantez, and Ball went to talk to Yang about getting the $100 back. The parties got into an argument and Vang, who was also present, tried to intervene. Nicole called the police. Two St. Paul police officers came to the building and noticed that Vang was "very drunk" and was not behaving calmly. The officers directed Vang not to intervene and left after referring the parties to the proper civil process to settle their dispute.

On March 24, 2004, 22 days after the rental dispute, Vang's body was found in a field adjacent to a commercial storage facility near Highway 52 in West St. Paul, Dakota County. The autopsy revealed that Vang had eight or nine entry stab

wounds and more than 30 other sharp force injuries on his body that were caused by two or three knives. Vang died from the loss of blood from these injuries. In addition to the sharp force injuries, Vang also suffered four blunt trauma injuries to his head, consistent with having been caused by a small baseball bat. Further, Vang had injuries to his thyroid area which could have been caused by a blunt pointed object, possibly a flat head screwdriver. According to the pathologist, Vang had a blood alcohol concentration of 0.182 at the time of death, but there was no evidence of drugs in Vang's system. Because the cold weather could have prevented the decomposition of Vang's body, the pathologist could not determine the time of death from the body.

After the police arrested Quantez and Robinson, they seized and examined Robinson's car. They found a spot of blood consisting of a mixture of DNA on the right passenger side door handle. The predominant DNA profile of this blood matched Vang's. The police were unable to identify the other DNA profile contained in the blood, but excluded Turnage's DNA from the mixture. The police later discovered that on March 2, 2004, at around 10:12 p.m., Robinson, Nicole, and Turnage went to a grocery store and bought first aid products. They also found that on March 3, 2004, at 1:15 a.m., Quantez went to Hennepin County Medical Center and, under the false name of Markee or Markees Jones, received treatment for severe lacerations to three fingers on his right hand.

Subsequent to their arrest, Quantez and Robinson both pleaded guilty to intentional second-degree murder and received sentences of 339 and 299 months respectively. Both testified for the state at Turnage's trial, but gave differing accounts of what had happened.

According to Quantez, he met Vang after he had moved into 834 University Avenue, and they quickly became friends and frequently used drugs together. On March 2, 2004, Quantez went to 745 University Avenue with Robinson and their girlfriends to settle the rent dispute with Yang. Vang was intoxicated and tried to get involved in the dispute. Vang argued with Robinson and then tried to rush Robinson, but Quantez got in the middle of it and pinned Vang down.

After the police arrived, Quantez went back to his apartment, told Turnage about what had happened, and the two of them laughed about it. Robinson then returned to the apartment and told Quantez that Vang was coming to beat Robinson up. Quantez met Vang in the hallway. Vang apologized to Quantez for Yang's behavior, and Quantez and Vang smoked marijuana together.

When Quantez returned to the apartment, Robinson told Quantez that they should go and get Vang. Quantez and Robinson found Turnage, and the three got into Robinson's car. When they saw Vang, Quantez called Vang over to the car and invited him to use some drugs together. Because the rear driver-side door did not open and the rear passenger-side door only opened from the outside, Quantez, who was sitting in the back, rolled down the window, opened the rear passenger door, got out of the car, and let Vang in. They drove a short distance and parked behind a house, and Quantez and Vang got high. Vang sang some rap lyrics and then suddenly "snapped out" and "told [Turnage] f—k him, basically."

Quantez fell asleep. When he awoke, Robinson's car was parked at the Cedarview Commons in North St. Paul, an apartment complex Quantez used to live in. Quantez noticed that Semela Rice, a girl Robinson was dating, was standing by the

car and asking Robinson for money. Later, Turnage's friend, Madjid Elbert, came to the car and talked to Turnage. Quantez then went back to sleep.

When Quantez woke up for the second time, he noticed the car was pulling into a long driveway. He also noticed that Robinson and Vang were arguing and tussling. Subsequently, Robinson and Turnage got out of the car, and Turnage let Quantez out. Quantez initially testified that when Vang got out of the car, Robinson hit Vang in the head with a miniature bat, and Vang took off running. Quantez then provided a different account, explaining that after Turnage got out of the car, Turnage "leaned in" and swung a straight razor toward Vang. Quantez tried to grab the razor and got cut.

Quantez testified that both Turnage and Robinson had knives in their hands and they both chased Vang. After a while, Turnage came back to the car and said, "This motherf——r won't die." Turnage then went to the trunk and ran back out into the field. Eventually, Turnage returned to the car, went to the trunk again, closed the trunk, hopped in the car, and they sped off. Quantez estimated that they were in the field 30 to 40 minutes. After returning to their apartment, Turnage collected the clothes that Robinson and Quantez had worn and put them in a bag with the weapons. Turnage and Robinson then left with the bag.

Robinson's testimony differed from Quantez's. First, Robinson did not state that he told Quantez to get Vang, but that they ran into Vang on the street. Second, Robinson testified that, as he was driving to North St. Paul, Turnage made a number of phone calls on Robinson's cell phone, including a call to Elbert in which Turnage asked Elbert for some "demos."[1]

Third, Robinson stated that at the Cedarview Commons apartment complex, Elbert came out and handed Turnage a brown plastic bag.

Robinson also gave a different account of the roles that he, Turnage, and Quantez played in Vang's death. According to Robinson, Turnage directed him to go to the storage facility in West St. Paul. After arriving, Turnage told Vang that he had to let the car air out because "Damien Robinson's girl" would not like the smell. Robinson got out of the car to go to the bathroom while Turnage let Quantez and Vang out of the car. Turnage then said "plug him" and stabbed Vang in the chest with a knife. Vang took off running, and Quantez tried to stab Vang with a knife. Turnage and Quantez then chased after Vang. After Quantez tackled Vang, both Turnage and Quantez stabbed Vang.

Turnage testified in his defense and denied killing Vang, stating he was not present when it happened. According to Turnage, instead of going to North St. Paul with Quantez and Robinson, he and Chapman did laundry at a laundromat. At around 8:00 p.m., after washing several loads of clothes, he went to a liquor store and bought some alcohol. He then talked to a friend on the street for about 10 to 15 minutes, and went back to his apartment. At around 9 or 9:30 p.m., Turnage received a call from his friend Cory Washington, and they met in the alley behind Turnage's apartment building. They sat in a car, talked, and smoked marijuana together. After that, Turnage went back to the apartment. Soon after, Robinson called Turnage and asked Turnage to meet him in 10 minutes. After Turnage got into Robinson's car, Quantez showed Turnage his bleeding hand. Turnage asked what

---

1. Robinson stated that he did not know what "demo" meant at the time, but later he learned that Turnage used the word to mean knife.

had happened, and Robinson told him "dude gone, we had some business, dude gone."

Several other witnesses also testified at the trial. Elbert testified that at about 7:25 p.m., he received a phone call from Robinson's phone and an unknown male voice asked for some knives. Elbert brought a chef knife and a boning knife in a tan bag, went downstairs and handed the bag to the person sitting on the passenger side of Robinson's car. Elbert claimed he did not recognize anyone in the car because it was really dark. At around 10:00 p.m., Elbert received another call from Robinson's phone where a person whose voice he did not recognize said somebody's fingers were cut and asked how to bandage a deep cut.[2] Elbert threw out the rest of the knife set when Quantez was arrested.

Rice testified that, on the evening of March 2, 2004, she was at Elbert's apartment and saw Elbert leave the apartment. She went out and saw Robinson, Turnage, and Quantez in Robinson's car. According to Rice, Elbert was standing on the side talking to Robinson. Rice saw a black coat in the back seat with Quantez, but it did not appear that there was a person in the coat.

Chapman testified that she did laundry with Turnage on the evening of March 2, 2005. Turnage left just before 8:00 p.m. to go to a liquor store. Turnage did not return to the laundromat and was not home when Chapman got back to the apartment. About 30 minutes later, Quantez and Robinson came into the apartment through the back door and, soon after, Turnage came in through the front door with alcohol in his hand. Quantez's hand was cut and he went into the bathroom with Ball. Turnage took Chapman into their bedroom and told her it was not their business that Quantez's hand was cut.

Tyrone Sain, an inmate who was in the Ramsey County Courthouse with Turnage on March 4, 2004,[3] testified that Turnage said he wished it would keep snowing because of a body in a field. Turnage showed Sain a cut in his hand and told Sain that he, his brother, and a friend killed a person in South or West St. Paul. Turnage did not think the authorities would find the body until the snow melted. Turnage also told Sain that he used something like a screwdriver to stab the person in the throat area and got the cut on his hand from stabbing the person.

Robert Jones testified that he was housed with Turnage at the Ramsey County Workhouse in March 2004. Jones noted that Turnage was "frantic" every day to see the Pioneer Press newspaper. When Jones asked Turnage why, Turnage explained to Jones that he and his brother had murdered a "Chinese dude," and that the body was beside a highway under snow.

Demont Bowie was Turnage's cellmate in the Dakota County Jail. As a result of testifying against Turnage, Bowie received a 10–day reduction in his sentence. According to Bowie, Turnage told Bowie that "his brother and them" had done "something" and hoped "they" would not tell on him. Turnage also told Bowie that the

---

**2.** Cell phone records showed the calls were made between Robinson's cell phone and Elbert's phone at 7:25 (2 minutes), 7:32 (2 minutes), 7:41 (2 minutes), 7:45 and 10:03 p.m. on March 2, 2004. Elbert, however, claimed that he did not remember the other phone calls that night.

**3.** On March 4, 2004, Turnage appeared for sentencing at the Ramsey County Courthouse regarding a charge of fleeing a peace officer in a motor vehicle. After sentencing, he was taken to the Ramsey County Jail and was later transported to the county workhouse.

father of the Asian person who was killed was upset about some rent money.

While housed at the Ramsey County Workhouse from March 4 to March 18, 2004, Turnage made several phone calls to Quantez and Elbert that were tape recorded by the facility. These conversations were played for the jury over Turnage's objection. In one conversation, Turnage told Quantez:

> It is snowing like a motherf——r * * *. That's a great thing. Every time some more inches come, I, I, I look forward to my out date, G, with no complications, you heard me.
>
> * * * *
>
> It look a little clearer cause I'm telling ya boy, once that sun come out, I'm moving to Chicago.

In another conversation, Turnage again commented to Quantez, "Yeah, man, I hope it get freezing cold again and starts snowing * * *."

On a three-way call between Turnage, Quantez, and a female, Turnage talked about the injury to Quantez's hand, stating, "[i]t was business. Serious s——t was going on when that happened. * * * That wasn't no damn joke when that happened. That was some serious s——t going on. * * * S——t, his hand, his hand was in the way."

In a telephone conversation with Elbert, Turnage engaged in the following dialogue:

Elbert: There's some s——t man we gotta talk about too man.

Turnage: What's that?

Elbert: I'm, we gonna let you know man tomorrow. * * * Real serious man. Very. It's

Turnage: It's a problem?

Elbert: It could be.

Turnage: With us?

Elbert: Not me. With ya'll.

Turnage: With us?

Elbert: Yeah. I'm going to let you know. We ain't telling D-thing yet because it's on him. * * * Yeah. That goofy ass [Rice] bitch. * * * Running her mouth * * * Told some s——t. Told Erica some s——t man. Know the whole f——king scoop. That f——king [Rice] bitch got a big ass mouth, man.

Turnage: On that, you talking about on the demo.

Elbert: Yeah.

Turnage: That bitch don't know s——t. * * *

Elbert: Yes the f——k he did dude.

Turnage: Oh, s——t.

Elbert: He told her every f——king thing. I had her sitting in the f——king house crying. * * * What the f——k is wrong with you. You know what I'm saying. Coming at me now like ya ya ya and I know what happened and I'm like what the f——k you talking about * * * [Robinson] told me everything that happened, you know what I'm saying, and Erica turned around like, yeah and told [Quantez]. I know exactly what happened * * *.

Turnage: Oh, f——k, now man, nigger, you know me, I keep the, I didn't even know the bitch know nothing * * *. Too much.

## I.

■ Turnage argues that there was no foundation to establish that the tape-recorded copies of the tapes of his telephone calls were the same as the originals. According to Turnage, the person who made the copies was not able to verify that the copies were accurate reproductions of the originals.[4]

4. We note that although Turnage objected to the admission of the copies of tapes at trial,

■ The district court has broad discretion over the admissibility of evidence, and the standard of review for the adequacy of foundation with respect to the admission of evidence is abuse of discretion. *See State v. Williams*, 337 N.W.2d 689 (Minn.1983); *State v. Johnson*, 307 Minn. 501, 504–05, 239 N.W.2d 239, 242 (1976).

In *Furlev Sales & Associates v. North American Automotive Warehouse, Inc.*, 325 N.W.2d 20, 27 n. 9 (Minn.1982), this court noted,

> There are seven foundational elements that must be established before a tape recording can be admitted: (1) a showing that the recording device was capable of taking testimony; (2) a showing that the operator of the device was competent; (3) establishment of the authenticity and correctness of the recording; (4) a showing that changes, additions and deletions have not been made; (5) a showing of the manner of the preservation of the recording; (6) identification of the speakers; and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement.

Minnesota Rules of Evidence 901(a) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Minnesota Rules of Evidence 1003 further states, "A duplicate [recording] is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."

At trial, the state called Sven Pieper, a technician responsible for recording the phone conversations and for making the tape. According to Pieper, the Ramsey County Workhouse records all the phone calls made by prisoners and stores them in a digital database. The recording system generates a report that contains the destination phone number, the length of the phone call, and the time and date of the phone call. A user can locate specific phone calls on the stored digital tapes by destination number and then use a recording machine to copy the digital recording to a regular tape recording. Pieper testified that during the relevant time period, the recording system recorded all the phone calls originating from the workhouse, the recording machine worked properly and there was no indication that any data was lost. Pieper testified that he located Turnage's calls by destination numbers and recorded them. Although Pieper did not directly compare the copies to the original, he listened to the conversations as they were recorded and confirmed that he had recorded the correct phone calls.

We conclude that the district court did not abuse its discretion in admitting copies of the tapes. First, the initial digital recordings of the phone conversations satisfy the required foundation elements that this court noted in *Furlev* and would have been admissible as original tape recordings. Second, the duplicated copies of the digital tapes satisfied the requirement for admitting a duplicate recording. As stated above, under Minn. R. Evid. 1003, the duplicate recording is admissible to the same extent of the original digital tape unless there is a genuine question regarding the authenticity of the original or it is

his objection focused on the relevancy of the taped conversation and the accuracy of the recording transcript and the foundation for

the admission, and not whether the duplicated tapes were the same as the original digital tapes.

unfair to admit the duplicate in lieu of the original. In light of Pieper's testimony regarding how the phone conversations were recorded and the copies were made, Pieper's admission that he did not compare the digital tapes to the regular tapes does not raise a genuine question of authenticity of the digital tapes. Further, there is no indication that it was unfair to admit the copies in lieu of the digital tapes.[5]

## II.

Turnage next argues that the evidence was insufficient to sustain the murder convictions because (1) the accomplice testimony of Turnage's participation in the murder was not corroborated and (2) the evidence necessary to prove kidnapping, as an essential element of first-degree intentional felony murder during kidnapping, was insufficient to establish anything but minimal or incidental confinement or removal of Vang.

## A.

 When reviewing the sufficiency of evidence to corroborate accomplice testimony, "we view the evidence in the light most favorable to the state and all conflicts in the evidence are resolved in favor of the verdict." *State v. Adams*, 295 N.W.2d 527, 533 (Minn.1980). Minnesota Statutes § 634.04 (2004) provides that "[a] conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." In *Adams*, this court held that adequate

corroboration means the "[c]orroborating evidence must link or connect the defendant to the crime" and "must point to the defendant's guilt in some substantial degree." *Adams*, 295 N.W.2d at 533.

The key elements of the testimony of Robinson and Quantez were that on the evening of March 2, 2004, Turnage joined them in the car; the three of them invited Vang into the car; Turnage called Elbert to ask for weapons; Elbert delivered knives to Turnage; Turnage directed Robinson to a secluded spot; Turnage let Vang out of the car, attacked him, pursued him into the field, and stabbed him to death; and Turnage then returned to the apartment with Robinson and Quantez.

Contrary to Turnage's assertion, Robinson's and Quantez's testimony was corroborated by other witnesses for the state in several material respects. Rice testified that she saw the three defendants together in Robinson's car at Elbert's apartment complex. Chapman confirmed that Turnage was not in her presence after leaving the laundromat and that the three defendants returned to the apartment at about the same time. Robinson's cell phone record supported Robinson's testimony that Turnage called Elbert to ask for some "demos."[6] Several witnesses testified that Turnage was familiar with the area in West St. Paul where Vang was killed because he had previously resided across the street with Chapman. Finally, and most importantly, Turnage's statements to various witnesses when he was in custody, and in the tape-recorded phone calls, provide corroboration that he had participated in the killing of Vang and was concerned that

---

**5.** The district court file discloses that the state gave notice to Turnage that it intended to offer the taped phone conversations in evidence. Turnage had the opportunity to review the digital recording and compare them to the duplicate tapes.

**6.** We do not consider the testimony of Elbert in this context because it could be argued that Elbert was also an accomplice.

the authorities might discover Vang's body. Viewing the evidence in the light most favorable to the state and resolving all conflicts in favor of the convictions, we conclude sufficient corroborating evidence existed not only to link Turnage to the crime but to substantially point to Turnage's guilt.

### B.

■ We next address Turnage's argument that the evidence is insufficient to support his conviction for murder during a kidnapping. Minnesota Statutes § 609.25, subd. 1 (2004), defines kidnapping as:

Whoever, for any of the following purposes, confines or removes from one place to another, any person without the person's consent or, if the person is under the age of 16 years, without the consent of the person's parents or other legal custodian, is guilty of kidnapping and may be sentenced as provided in subdivision 2:

(1) to hold for ransom or reward for release, or as shield or hostage; or

(2) to facilitate commission of any felony or flight thereafter; or

(3) to commit great bodily harm or to terrorize the victim or another; or

(4) to hold in involuntary servitude.

We have held that "where the confinement or removal of the victim is completely incidental to the perpetration of a separate felony, it does not constitute kidnapping." *State v. Smith*, 669 N.W.2d 19, 32 (Minn.2003). In *Smith*, the victim was first attacked in the bedroom and then was blocked from the doorway when he tried to escape. *Id.* at 23. We concluded that the momentary confinement of the victim, which occurred only after the attack that culminated in the murder was underway, was "completely incidental" to the murder, and therefore, did not consti-

tute kidnapping. *Id.* at 32–33. Similarly, in *State v. Welch*, 675 N.W.2d 615, 620–21 (Minn.2004), we reversed the defendant's kidnapping conviction, concluding that "the confinement that forms the basis of the kidnapping is the very force and coercion that supports the attempted second-degree criminal sexual conduct conviction."

Turnage argues that the confinement of Vang in the car did not constitute kidnapping because Vang entered the car voluntarily and consented to the trip. Turnage argues that the confinement and removal of Vang in the field were completely incidental to the murder that was immediately underway when Vang got out of the car.

■ When reviewing sufficiency of evidence to support a verdict, we view the evidence in the light most favorable to the verdict. *State v. Pierson*, 530 N.W.2d 784, 787 (Minn.1995). We conclude that sufficient evidence existed to demonstrate that the confinement and removal of Vang in the car was accomplished without Vang's consent, and thus supported a finding of kidnapping.

Vang was intoxicated when he entered the car, and a jury could reasonably conclude that Vang lacked the capacity to give a valid consent. More importantly, there was evidence from which the jury could conclude that Turnage and his accomplices lured Vang into the car by fraud. Specifically, a jury could find that the three defendants planned to harm Vang from the very beginning; that they tricked him into getting into the car by telling him they merely wanted to drive around and use some drugs; that they traveled a considerable distance to North St. Paul to obtain the murder weapons; that they then drove another considerable distance to West St. Paul to a secluded spot to commit the murder; and that, the entire time, Vang

was confined in the back seat next to an inoperable door and blocked from the other door by Quantez. Accordingly, the jury could reasonably conclude from this evidence that any consent by Vang to enter the car was legally ineffective.

This conclusion is consistent with our decision in *State v. Budreau*, 641 N.W.2d 919 (Minn.2002). There, the defendants lured the victim into their car on the false premise that they were going to drive to one location to buy some drugs when, in fact, they planned to drive to a different, secluded location to murder her. *Id.* at 930. We held that the victim "only consented to go to a place where they could buy drugs, but did not consent to be taken to the isolated construction site where the assault and murder occurred." *Id.* Similarly, we conclude that Vang consented to drive around to use drugs but did not consent to drive to the secluded place where the assault and murder occurred. Accordingly, we hold that the evidence was sufficient to support the jury's finding of kidnapping.

### III.

■ Finally, Turnage argues that the jury instruction on kidnapping was erroneous because the district court failed to inform the jury, consistent with *Smith* and *Welch*, that any confinement or removal that was incidental to the murder was insufficient to constitute kidnapping. The district court did instruct the jury on the general elements of kidnapping, using CRIMJIG 15.02, which states, in pertinent part:

The elements of kidnapping are:

First, the defendant confined or removed [Vang] from one place to another without [his] consent.

\* \* \* \*

To confine a person is to deprive the person of freedom. A physical restraint

is not necessary; a person can restrain another by threats of force. To remove a person from one place to another is to cause the person to move from the place where the person was to another place. It is not necessary that the defendant have physically transported [Vang]. It is sufficient if the removal was accomplished by the threat of force.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 15.02 (4th ed.1999).

■ The parties agree that, because Turnage did not object to the instruction in question at the trial, the issue should be reviewed under a plain error analysis. *See State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998), (stating absent plain error affecting a defendant's substantial rights, a trial court does not err when it does not give a warranted jury instruction if the defendant has impliedly or expressly waived that instruction). Plain error requires a finding of (1) error, (2) that was plain, (3) that affected substantial rights. *Id.* An error is plain if it is clear and obvious. *State v. Baird,* 654 N.W.2d 105, 113 (Minn.2002). Further, a plainly erroneous jury instruction affects substantial rights if there is a "reasonable likelihood that the giving of the instruction in question would have had a significant effect on the verdict of the jury." *Griller,* 583 N.W.2d at 741 (quoting *State v. Glidden,* 455 N.W.2d 744, 747 (Minn.1990)).

■ We do not address whether, under other facts, the district court must instruct the jury consistent with *Smith* and *Welch* because we conclude, under these facts, such an instruction was not required. As this court stated in *State v. Dahlin,* in deciding whether a specific jury instruction should be given, a reviewing court must view the evidence in the light most favorable to the party requesting the in-

struction to determine whether the trial court abused its discretion. 695 N.W.2d 588, 598 (Minn.2005). A trial court's refusal to give a jury instruction constitutes an abuse of discretion if the evidence warrants such an instruction. *Id.* Here, the question is whether, when viewed in the light most favorable to Turnage, the evidence would support a jury finding that the confinement and removal of Vang were completely incidental to the murder.

Because Turnage denied being present in the car or at the West St. Paul field, his testimony does not provide any basis for the court to consider an instruction under *Smith* and *Welch.* Accordingly, Turnage must rely on the testimony of other witnesses concerning how Vang was induced to enter the car, transported to various locations and pursued from the car to the field where he was murdered. It is true that the jury could have found from this evidence that Vang entered the car voluntarily, because Robinson never mentioned any previous discussion about "getting" Vang. But the testimony that Turnage and his accomplices drove to North St. Paul to obtain the murder weapons is not negated or contradicted by any witness. Thus, at least from the time of the visit to North St. Paul, the evidence demonstrates that Vang was taken to West St. Paul for the purpose of assaulting him with knives, a purpose to which he certainly never consented. Thus, as in *Budreau,* Turnage's conduct "did not involve only minimal acts of confinement or removal, nor were his actions 'completely incidental' to the murder committed in the course of the kidnapping." *Budreau,* 641 N.W.2d at 930. Given the length of the removal of Vang from North St. Paul to West St. Paul and his confinement in the car for that distance, well before the assault got underway, there was no evidence on which the jury could have found that the removal and confinement were merely incidental to the murder. Instead, the removal and confinement were criminally significant because they both preceded and facilitated the commission of the murder.

Accordingly, we hold that the district court did not err in instructing the jury on kidnapping.

Affirmed.

PAGE, J., took no part in the consideration or decision of this matter.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.