**Lillian Virginia DUNN,<br>Petitioner/Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. C5–91–1429.**

Supreme Court of Minnesota.

June 26, 1992.

John Stuart, State Public Defender, Susan Hauge, Asst. State Public Defender, Minneapolis, and Lillian Virginia Dunn, Shakopee, for petitioner/appellant.

Tom Foley, Ramsey County Atty., Darrell C. Hill, Asst. Ramsey County Atty., St. Paul, and Hubert H. Humphrey, III, Atty. Gen., St. Paul, for respondent.

GARDEBRING, Justice.

A Ramsey County jury found appellant guilty of first-degree felony murder in violation of Minn.Stat. § 609.185(3) (1990), second-degree intentional murder in violation of Minn.Stat. § 609.19(1) (1990) and kidnapping in violation of Minn.Stat. § 609.25 (1990). She was sentenced to life in prison for murder, and to a concurrent 43 months for kidnapping. Appellant petitioned for postconviction relief on two grounds: that

the evidence was insufficient to support her convictions and that she was denied a fair trial when the trial court admitted autopsy photographs and a videotape of the police recovering the victim's body from an automobile trunk. Her petition was denied and this appeal ensued.

The immediate issues before us are whether there was sufficient evidence to support appellant's convictions and whether the trial court erred in admitting certain photographic evidence. As to those issues, we affirm. In a pro se brief filed shortly before oral argument, appellant also alleged that she was denied a fair trial because the jury included a relative of the police officer who arrested her. Because we do not have adequate information to evaluate that allegation, we remand the case to the trial court for consideration of this issue.

Appellant and the victim, Marlizza (a/k/a Marcy) McIntyre, were longtime friends whose relationship became strained because both had been romantically involved with the same man. Nonetheless, on May 22, 1989, McIntyre agreed to have lunch with appellant and to accompany her to obtain a protective order against the boyfriend, who allegedly had beaten appellant for informing police of his drug activities.

Appellant and McIntyre eventually went to a St. Paul apartment where some friends had agreed to babysit for appellant's two children. The apartment's tenants were Gary Roby and Sheila Larson, James Roby and LaSheryl Yearby, Kenneth Fisher, Katie Roby Bell and Bell's two children, and John Roby. Gary Roby, John Roby, James Roby and Katie Roby Bell are siblings. Also present was Alicia Jordan, Gary Roby's former lover who still visited frequently. Appellant was acquainted with most of the people; McIntyre was not. At some point that day, McIntyre was held to the kitchen floor and shot to death.

There are essentially three versions of what happened. Appellant's version was that the gun accidentally went off during a struggle while she was trying to save McIntyre from Gary Roby. Fisher, whom the trial judge called the most truthful state witness,[1] testified that appellant helped hold down McIntyre and tried to remove McIntyre's rings before and after the time Gary Roby fired the fatal shot.[2] Larson and Jordan testified that appellant did the shooting, but that testimony is suspect because they are close to the Roby family; each has a child by Gary Roby, and Fisher testified that Jordan and Larson were not in a position to see the shooting. Fisher also testified that Gary Roby had instructed the others to deny knowledge of the murder and to blame appellant.

Appellant did not testify at trial, but in a statement to police, which was admitted into evidence, she suggested that McIntyre was killed when a drug deal with Gary Roby went sour. Appellant told police that she and McIntyre had picked up some drugs to sell to Gary Roby and that when they went to the apartment McIntyre handled the drug deal in the kitchen while appellant went to the back bedroom to check on her children. She also told police that while she was in the bedroom, either Jordan or Bell came in and said that Gary Roby was "messing up" the drug deal.

In her statement, appellant told police she went to the kitchen when she heard McIntyre call her name. Once there, she said she found John and Gary Roby holding down McIntyre while Gary Roby tried to force McIntyre's head into a bucket. Appellant said that McIntyre said that she had hold of a gun. Appellant told police that she tried to recover the gun and got two fingers on the trigger while Gary Roby had the grip and McIntyre held the nose. At appellant's request, McIntyre let go and the gun went off three times as appellant was pulling it away. Appellant argues that her version of events is corroborated by the testimony of Yearby, who said that she came to the kitchen after the shooting

---

1. Fisher was testifying under a grant of immunity. He had been charged with aiding an offender to avoid arrest and interference with a death scene.

2. Police ultimately found three bullet holes in the kitchen floor, all consistent with a .22 caliber weapon. It is not clear when, why or by whom the other two shots were fired.

and saw appellant holding a gun over the victim's body.

But appellant's claim that the shooting was accidental is contradicted by other evidence. First, the suspected murder weapon, which police later seized from the apartment, was a single-action .22 caliber revolver that required manual re-cocking each time it was fired. If that was indeed the murder weapon, appellant's rapid-fire multiple-shot theory is impossible.

In addition, the state presented evidence which, if believed, could be interpreted to suggest that appellant and Gary Roby were acting in concert. There was testimony that after speaking with appellant, Jordan told Larson that "somebody is going to get shot." There was testimony suggesting that Gary Roby's motive could have been robbery because he had unsuccessfully asked four of his roommates for gasoline money. There was testimony that before McIntyre was restrained and shot, appellant went to the living room, pulled a handgun from her purse, cocked it, returned it to the purse, then went back to the kitchen and set the purse near McIntyre. There was testimony that appellant and Gary Roby left the kitchen and talked briefly before returning separately. And there was testimony that a few minutes later appellant asked Jordan if Gary did it yet and that appellant said she couldn't do it.

Larson testified that shortly after the shooting, appellant said she had just killed her best friend. Yearby testified that after the shooting, appellant asked her what she thought of her now. The day after the shooting, appellant pawned McIntyre's rings for $60; she contends now that this was done to preserve evidence. Despite her knowledge that McIntyre was dead, appellant also called McIntyre's place of employment several times and left messages for McIntyre. She told McIntyre's mother that McIntyre had dropped her off at about 2:30 and returned to work.

Shortly after the shooting, Bell took a green drape from the living room area and brought it to the kitchen. Bell dropped it over the body, and Gary Roby, John Roby, James Roby and appellant wrapped the body with it. They carried the body downstairs and the Roby brothers placed it in the trunk of McIntyre's car while appellant watched. The brothers covered the body with a piece of carpet and they tied down the trunk. When they learned the car was not operable because of a broken steering wheel, the Roby brothers rented a tow bar, attached it to the car, then towed it away and parked it along a city street. Police discovered the car and the body two days later.

During the police investigation, following up an anonymous tip that Fisher was involved, police arrested appellant and all of the apartment occupants. Gary Roby was wearing one of McIntyre's necklaces at the time of his arrest. After getting a warrant to search the apartment, police recovered the gun, a green drape of the same type that was wrapped around McIntyre's body, two sets of window blinds, one of which was missing its cord, and a cardboard box that contained McIntyre's credit cards. Later, police recovered the pawned jewelry and pawn tickets signed by appellant.

At trial, among other evidence, the state introduced a videotape of police officers pulling the victim's carpet-wrapped body from the car trunk. The videotape also included footage from the autopsy, but the trial court ordered that the tape be stopped at the point where the autopsy began. Over defense objection, the court did admit photographs from the autopsy.

In her petition for postconviction relief, appellant claims that the evidence against her was insufficient to establish guilt beyond a reasonable doubt and that she was denied a fair trial when the trial court admitted photographic evidence of the victim's body. The postconviction court denied her petition.

If the evidence amply supports the postconviction court's findings, a reviewing court must affirm. *Skavene v. State,* 290 Minn. 527, 528, 188 N.W.2d 419, 420 (1971). Our review of a challenge to the sufficiency of the evidence is similarly limited. We must view the evidence in a light most favorable to the conviction and determine whether it is sufficient to support the ver-

dict. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989).

A reviewing court assumes "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). It is the function of the jury to determine the weight and credibility of the testimony. *Id.* "Inconsistencies or conflicts between one state witness and another do not necessarily constitute false testimony or a basis for reversal." *State v. Daniels*, 361 N.W.2d 819, 826 (Minn.1985).

■ Appellant's sufficiency argument is, essentially, twofold: (1) that the witnesses against her were so contradictory, biased or inherently unbelievable that the jury had little choice but to find a reasonable doubt about her guilt; and (2) that appellant's version of the facts is consistent with the testimony of eyewitnesses Larson and Jordan, except that those two women arrived late and did not appreciate the accidental nature of the shooting. Appellant also theorizes that if the jury believed Fisher, it could not have believed Jordan and Larson, because Fisher placed them out of sight of the crime scene. If that is so, appellant argues, it becomes crucial that Fisher did not observe the events leading up to the shooting, so there is no evidence to establish that appellant aided, abetted or conspired with Gary Roby to commit murder. Conversely, if the jury believed Jordan and Larson, it could not have believed Fisher because Jordan and Larson testified that Fisher did not come to the kitchen until after the shooting.

We find no merit in any of appellant's arguments. Whether the jury believed Fisher or Larson and Jordan, there is ample evidence to support appellant's convictions. If the jury believed Fisher's view of the facts, it could find appellant guilty of felony murder for aiding and abetting a murder in the course of an aggravated robbery. If jurors believed Larson and Jordan, they could find appellant guilty of felony murder by committing an intentional but unpremeditated murder to facilitate a contemporaneous aggravated robbery of the victim's body. *See State v. Nielsen*,

467 N.W.2d 615, 618 (Minn.1991); and *Kochevar v. State*, 281 N.W.2d 680, 686 (Minn.1979) (When felony and homicide "are parts of one continuous transaction" the felony murder rule applies.).

■ The kidnapping conviction also is valid. The kidnapping statute provides in relevant part:

Whoever, for any of the following purposes, confines or removes from one place to another, any person without the person's consent * * * is guilty of kidnapping * * *:

*   *   *   *   *   *

(2) To facilitate commission of any felony or flight thereafter * * *.

Minn.Stat. § 609.25, subd. 1 (1990). In this case, appellant was convicted of confining the victim to facilitate commission of aggravated robbery. That conviction is supported by the evidence. It does not matter that the confinement was an integral part of the robbery or the murder. This court has found it "significant" that the legislature included no time or distance factors in the kidnapping statute and has upheld convictions based on only small degrees of confinement or movement. *See State v. Morris*, 281 Minn. 119, 121, 160 N.W.2d 715, 717 (1968); *State v. Crocker*, 409 N.W.2d 840, 844 (Minn.1987). Based on the evidence in this case, the jury heard and saw ample evidence that appellant held down McIntyre during the commission of an aggravated robbery. That act would be sufficient to sustain a kidnapping conviction.

■ Appellant's argument about the videotape and photographs also must fail. This court has consistently applied the following standard for the admissibility of photographs:

Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to ju-

rors the details of a shocking crime or incidentally tend to arouse passion or prejudice.

*State v. De Zeler*, 230 Minn. 39, 46–47, 41 N.W.2d 313, 319 (1950) (emphasis in original). The admission of photographs is in the trial court's discretion, *State v. Daniels*, 361 N.W.2d 819, 828 (Minn.1985), subject to the requirement that the probative value substantially outweigh any unfair prejudice. Minn.R.Evid. 403.

■ The autopsy photographs in this case were admissible to illustrate the medical examiner's testimony and to corroborate eyewitness testimony as to how the shooting occurred. The number of photographs was not excessive, nor was the content of the photographs unduly prejudicial. Similarly, the videotape in this case corroborated live testimony and was not especially graphic. Furthermore, the trial court properly ordered that a potentially prejudicial section of the tape not be played and it was not. In sum, we are satisfied that the trial court did not abuse its discretion in the admission of these photographic materials.

■ Although we affirm the postconviction court's decision on these substantive issues, we nonetheless must remand the case for further fact finding. Appellant has alleged that the jury included the brother-in-law of the officer who arrested her. The record before us is silent on procedural safeguards employed during jury selection and neither attorney at oral argument was prepared to address appellant's allegations in detail. Therefore, we remand to the trial court for the limited purpose of consideration of appellant's claims with regard to jury membership. Upon completion of the proceedings at the trial court, review, if any is sought, shall be accomplished by the filing of a motion to reinstate the appeal, accompanied by a certified copy of the trial court's decision.

Affirmed in part and remanded.