**STATE of Minnesota, Respondent,**

v.

**Darnell Christopher SMITH, Appellant.**

**No. C8–02–1292.**

Supreme Court of Minnesota.

Sept. 25, 2003.

Mark D. Nyvold, St. Paul, for Appellant.

Amy Klobuchar, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, and Mike Hatch, Attorney General, St. Paul, for Respondent.

OPINION

MEYER, Justice.

Appellant Darnell Christopher Smith was convicted in Hennepin County of premeditated murder in the first degree and murder in the first degree while committing kidnapping, and was sentenced to life without possibility of release for the death of Bobby Dee Holder. On appeal, appellant alleges that both convictions should be reversed because the district court erred when it admitted evidence of the dismem-

berment of Holder's body and evidence of appellant's past crimes. Appellant also asserts that the evidence supporting both convictions was insufficient as a matter of law. Appellant further alleges certain errors in his sentencing. We affirm in part, reverse in part, and remand to the district court.

The state's case against appellant was largely based on the testimony of appellant's brother Chaka Smith, who pleaded guilty to second-degree felony murder and was sentenced to 20 years in prison for his part in the crime. According to Chaka, on July 5, 2001, appellant told him "that he was going to have Bobby [Holder] come over so he could f—— him up." Appellant believed that Holder was trying to set him up to be robbed of some wheel rims appellant had purchased from Holder. Appellant asked Chaka to be a standby and a lookout when Holder came to appellant's house. Chaka understood his role as standby to mean that he would make the fight uneven.

Chaka testified that he and appellant hid in the bathroom as appellant's girlfriend, Tina Leja, greeted Holder at the front door of the house. Appellant had a police flashlight in his hand and a handgun in his waistband. After Holder was in the house, Chaka sneaked out the back door to confirm that no one else had come with Holder.

When Chaka returned, he saw Holder in the bedroom and appellant holding the police flashlight above his head and creeping up on Holder. Appellant pushed open the door to the bedroom and struck down with the flashlight. Chaka did not see appellant hit Holder but did hear a loud thud. Chaka heard struggling and fighting and then went to the door of the bedroom, where he saw appellant chasing Holder around the room, hitting him with the flashlight. Holder tried to flee the room, but Chaka blocked his means of escape by standing in the doorway and putting his hands on the walls. Appellant then shot Holder in the lower back and Holder fell to the floor. According to Chaka, Holder said: "Let me go to the hospital. I don't know you, and if I get questioned I'll say I don't know." Appellant responded, "You're not going anywhere."

Chaka then attempted to leave the house but was told to return by appellant. While standing in the living room, Chaka looked into the bedroom and saw appellant point the gun at Holder's face and pull the trigger. The gun did not fire. Appellant chambered a round, put the gun on Holder's shoulder blade and pulled the trigger again; this time the gun fired, killing Holder. Appellant then dragged Holder's body from the bedroom into the living room. He went through Holder's pockets; took Holder's cash, car keys, a small bag of marijuana, and cell phone; and gave everything but the cash to Chaka. Appellant stripped the body and, using a pocketknife found in Holder's pants pocket, cut off Holder's penis. He then told Chaka to help him clean the area where the murder had occurred.

Later, Chaka drove Holder's car to Woodbury so it would not be found near appellant's house. Early the next morning, appellant called Chaka and told him to return because Holder had relatives in the Woodbury area who might recognize his car.

Chaka returned to the house and found appellant in the basement with Holder's body. Appellant told Chaka that he had intended to bury the body there but could not dig through the concrete, so decided to chop the body up. Appellant began to dismember the body, which caused Chaka to vomit, and Chaka went back upstairs. Appellant called Chaka back downstairs and Chaka watched as appellant completed

the dismemberment. Appellant then stabbed the body with a pocketknife. Chaka testified that at one point appellant shook the hand of Holder's dismembered arm while saying, "How are you doing?" According to Chaka, appellant used a box cutter to carve "Bloods Rule" into the back of Holder's body to make the murder look gang affiliated. Appellant also unsuccessfully attempted to remove the tattoos from Holder's body. He placed Holder's remains in a cooler, a plastic bag, and a bed sheet.

Additional incriminating testimony was provided by Andre Parker, who pleaded guilty to the felony offense of aiding an offender for his involvement in this crime. Parker testified that he was a friend of appellant and lived in the same house. The day after the murder, Parker went into appellant's room and appellant showed him Holder's dismembered remains. He told Parker that they belonged to someone who had tried to rob him. He asked Parker to help him take the body parts out to appellant's car and take a ride with him and Leja. The three drove to a park in St. Paul intending to dispose of Holder's remains, but returned to the house because there were too many people at the park. They moved Holder's remains from appellant's car to Leja's car. On appellant's instruction, Leja drove her car containing Holder's remains to Wisconsin and Parker followed behind in Holder's car. Parker and Leja went to a property in rural Wisconsin where they dug a shallow grave in a swampy area and buried the torso. Appellant and Chaka remained at the house. They then headed west; at one point they turned off onto an unpaved road and dumped the rest of Holder's remains in a densely wooded area.

Appellant's younger brother, Ramon Smith, testified pursuant to a plea agreement granting him immunity from prosecution in the case and favorable treatment on an unrelated criminal charge. Ramon testified to certain admissions made by appellant concerning Holder's death. Appellant told Ramon that he first pointed the gun at Holder's head and pulled the trigger but the gun did not go off. He "re-racked" the gun (chambered a round) and shot Holder "in the hip, right around * * * the kidney area." Holder fell to the floor and begged for help; appellant responded with derisive remarks, then pointed the gun at Holder's shoulder and shot him again. As Holder "flopp[ed] around" and lay dying, appellant knelt beside him and ridiculed him. Appellant told Ramon that he was going to bury Holder's body in the basement, but when he started digging he saw other bones, panicked, and ended up dismembering the body. Appellant also told Ramon that he was leaving town because the police were on to Chaka and would eventually catch both of them.

Katrina Valley, Ramon's girlfriend, testified that the night of the murder she saw appellant's girlfriend talking on the phone (presumably to Holder) while appellant whispered in her ear, "Tell him I don't live here. That this is your house." She also testified that when she entered the house the night of the murder, appellant was sitting on his bed cleaning his gun.

Maynard Cross, an acquaintance of appellant, testified concerning certain admissions made by appellant pursuant to a plea agreement. Appellant told Cross that he had killed and robbed a man and then cut the man up. Cross testified that the day after the killing he saw some spots of blood inside appellant's house and heard appellant say that he had missed some blood when cleaning up. Cross also testified that appellant showed him Holder's penis located in the bushes outside appellant's house.

The Hennepin County medical examiner testified that Holder had received two gunshot wounds, one in the flank area and the other in the neck area, which resulted in his death.

Appellant testified as the sole defense witness. He claimed that he knew Holder because he bought some wheel rims from him. After appellant put the rims on his car, he had been followed periodically, and started to receive telephone calls in which the caller mentioned the wheel rims and threatened to shoot him. Appellant understood this message to mean that he had bought stolen wheel rims or that someone was going to steal the wheel rims from him. Appellant claimed that later, while in his car waiting at a traffic light on Franklin Avenue in Minneapolis, four men, one of whom had a gun, walked toward appellant's car. Appellant showed his own gun and the men ran off.

Appellant testified that he never intended to kill Holder and the reason he called Holder over to his home was to confront Holder about setting him up to be robbed. His plan was to beat Holder up if he determined that Holder had set him up. Appellant had Leja call Holder to come to appellant's house to pick up some tools Holder had left behind after helping put the wheel rims on appellant's car. Appellant knew Holder had been calling Leja and that she would be able to persuade him to come to the house.

Appellant testified that when Holder came in the house, Holder went into the bedroom with Leja. Appellant waited and watched from outside the bedroom. He testified that Holder was giggling, laughing, and fondling Leja, and Holder told her that he had helped set up appellant. Appellant testified that when he heard this he attacked Holder. Holder pulled a knife, appellant grabbed Holder's arm, and the two exchanged punches. Appellant yelled

for Chaka to help him. Chaka hit Holder with a flashlight while appellant wrestled with him. Holder then turned on Chaka with the knife and Chaka started screaming "shoot him, shoot him." Appellant reached in a drawer, grabbed his gun, and tried to shoot Holder. The gun did not go off so appellant re-racked the gun, put it to Holder's back and shot him. Holder then turned on appellant with the knife. Appellant shot him again. At that point, Holder fell to the floor and begged to be taken to the hospital. Appellant claimed Holder died just after that and was not conscious for even a minute. Appellant did not call for help because he was in shock. Appellant testified that throughout the incident Chaka did nothing to prevent Holder from leaving the room.

Appellant and Chaka began digging a hole in the basement to dispose of the body, but appellant worried about the smell the body would create and abandoned that plan. They then planned to throw the body into the Mississippi River. Appellant claims Chaka stabbed the body in the chest, believing it would prevent the body from floating to the surface. Appellant then determined that they would be unable to move Holder's body from the house to the river without being detected, so they decided to dismember it. Appellant also testified that he removed Holder's penis to prevent the body from being identified as male.

The jury found appellant guilty of premeditated murder in the first degree, Minn.Stat. § 609.185(a)(1) (2002), and murder in the first degree while committing a kidnapping, Minn.Stat. § 609.185(a)(3) (2002); appellant was sentenced to life in prison without the possibility of release.

In this direct appeal, appellant makes the following claims: (1) the district court abused its discretion and denied him a fair trial by allowing the state to present irrel-

evant and prejudicial evidence of the dismemberment and disposition of Holder's remains; (2) the court violated appellant's right to a fair trial by permitting the state to introduce impeaching evidence of appellant's prior convictions without fully analyzing the admissibility of those convictions under *State v. Jones*, 271 N.W.2d 534 (Minn.1978); (3) the evidence of premeditation for the first-degree premeditated murder charge was insufficient as a matter of law; (4) the evidence of kidnapping to support the conviction for first-degree murder while committing kidnapping was insufficient as a matter of law; (5) the court erred when it sentenced him to life without possibility of release under Minn. Stat. § 609.106, subd. 2(3) (2002); (6) the court did not properly order appellant to pay restitution; and (7) the court erred when it sentenced appellant on each count of conviction because Minn.Stat. § 609.035 (2002) prohibits punishing a defendant for more than one crime arising out of a single behavioral incident. We affirm in part, reverse in part, and remand to the district court.

## I.

Appellant's first claim is that the district court abused its discretion and denied him a fair trial by allowing the state to present evidence of the dismemberment and the disposition of Holder's remains. At trial, appellant moved to suppress evidence that he dismembered Holder's body, that the torso was buried in rural Wisconsin, and that the dismembered parts were scattered elsewhere. He argued that this evidence was not relevant under Minn. R. Evid. 402, and, even if relevant, under Minn. R. Evid. 403 any relevance was outweighed by the highly prejudicial and inflammatory impact of the evidence.

The district court denied appellant's motion, finding that the dismemberment and

disposal of the body were circumstantial evidence of intent to kill and premeditation. The court stated that the evidence demonstrated "a grisly hatred and disrespect for the victim," which showed a motive for premeditated killing and indicated a plan to kill. It also corroborated other evidence of premeditation. The court further found that the dismemberment was part of the plan to hide the body, which "is circumstantial evidence of premeditation." Finally, the court reasoned, "[the body] was dismembered, and the autopsy is going to * * * be necessary * * * to prove *corpus delecti*, [to] prove that in fact a homicide was committed and that a person was killed."

We review a district court's decision to admit evidence under an abuse of discretion standard of review. *State v. Kelly*, 435 N.W.2d 807, 813 (Minn.1989). Reversal is required for the erroneous admission of evidence when the admission of that evidence substantially influenced the jury to convict. *State v. Lee*, 645 N.W.2d 459, 465 (Minn.2002).

We begin by examining the relevancy of the evidence on the question of premeditation under Minn. R. Evid. 402, which provides: "Evidence which is not relevant is not admissible." To premeditate is "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (2002). Premeditation is a state of mind. *State v. Johnson*, 616 N.W.2d 720, 726 (Minn.2000).

Our case law recognizes that a defendant's actions before and after a killing are relevant to the issue of premeditation. *State v. Lodermeier*, 539 N.W.2d 396, 398 (Minn.1995) (holding that evidence bearing on premeditation includes "the defendant's words and actions before, during and after the killing"); *State v. Griller*,

583 N.W.2d 736, 743 (Minn.1998) (noting that "it seems even more implausible that after killing in self-defense or defense-of-dwelling, one would dismember the body and bury it in one's backyard"). The Court of Appeals for the Eighth Circuit has also held that evidence of dismemberment and disposal of a victim's remains may be relevant circumstantial evidence of premeditation. *Mason v. Lockhart*, 881 F.2d 573, 575 (8th Cir.1989) (concluding that the "jury could have reasonably inferred from the nefarious method" by which the defendant disposed of the victim's body (dismemberment and burial) that the defendant's actions were deliberate and premeditated).

Appellant argues that the present case is distinguishable from the case law because the conduct did not immediately follow the killing, and the nature of the conduct did not tend to show premeditation. Appellant also claims that the district court's conclusion that the dismemberment and method of disposal showed "grisly hatred and disrespect for the victim" was incorrect because dismemberment and disposal occurred only because the initial plan to dispose of the body was abandoned.

■ As the state points out, evidence was presented at trial that one aspect of the dismemberment occurred immediately after the crime. Chaka Smith testified that appellant cut off Holder's penis soon after the murder. This act does seem to show appellant's state of mind at the time of the crime and is circumstantial evidence of premeditation. The probative value of the evidence is not necessarily diminished because minutes passed between the time of the murder and the time of the dismemberment. Nor is the probative value of the evidence weakened by the fact that appellant's decision to dismember Holder only came about after a burial plan was abandoned. Thus, we conclude that the

district court did not abuse its discretion by admitting the challenged evidence concerning dismemberment.

■ Appellant also argues that evidence about how the body was disposed of by Leja and Parker was not relevant. The testimony was that appellant, Parker, and Leja had traveled to a park in St. Paul in order to dispose of the body, but abandoned that plan because of the number of people in the park. After that aborted attempt, appellant helped load the body parts in Leja's car, and instructed Parker to follow Leja in Holder's car. Furthermore, Leja received cell phone calls during the process of disposal and the inference could be made that appellant was providing instruction. We conclude that appellant's efforts to hide the body were relevant to the issue of premeditation and, therefore, the actions of Leja and Parker in disposing of the body were relevant as well.

We turn to appellant's contention that the prejudicial effect of the admission of the evidence outweighs its probative value. Minnesota Rule of Evidence 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Appellant cites two cases, *State v. Townsend*, 546 N.W.2d 292 (Minn.1996), and *State v. Harris*, 521 N.W.2d 348 (Minn.1994), in support of his position that evidence of Holder's dismemberment and the disposal of his remains were erroneously admitted. In *Harris*, this court concluded that the district court had abused its discretion by admitting evidence that the defendant, while awaiting trial, had masturbated in his jail cell while looking at a newspaper photo of the victim. 521 N.W.2d. at 353. We held that this evidence had no probative value and was not relevant, and that even if the evidence was

relevant, it "was so extremely prejudicial that it should have been excluded." *Id.*

In *Townsend,* the defendant was charged with murder. 546 N.W.2d at 294. In a separate trial, he faced attempted murder charges for an assault of a different victim that occurred the same night. *Id.* at 295. In the murder trial, evidence was admitted about the crime scene of the assault, the nature of the assault victim's injuries, and the assault victim's pregnancy. *Id.* at 295. We concluded that some evidence of the assault was relevant in the murder trial to prove motive or identity, but the cumulative evidence admitted was error because it "[did] nothing but inflame the jury improperly." *Id.* at 296. However, we concluded that the error was harmless beyond a reasonable doubt because the other evidence of the defendant's involvement was "so overwhelming as to lead a reasonable jury to arrive at the verdict even without the prejudicial evidence." *Id.* at 297.

■ Our decisions in both *Harris* and *Townsend* focused on the marginal relevance of the evidence when concluding that the evidence in question was prejudicial and should not have been admitted. Here, the evidence at issue is probative of the appellant's state of mind toward Holder and is circumstantial evidence of premeditation. Under the facts of this case, we conclude that the evidence of dismemberment and disposal was not so prejudicial as to outweigh its probative value. Additionally, as noted by the district court, pictures and descriptions of Holder's torso would be separately admissible to establish corpus delecti; i.e., proof that a murder was committed. That proof would necessarily include a description of the location of the body and how the body came to be found there, and the body's condition and how it came to be in that condition. The jury should not be left to speculate about these basic facts if the evidence is available. In sum, the district court did not abuse its discretion by admitting evidence of Holder's dismemberment and the disposal of his remains.

Appellant singles out two particular instances for closer scrutiny under Minn. R. Evid. 403. The first instance is testimony from Chaka Smith that appellant shook the hand of Holder's dismembered arm while stating, "How are you doing?" The second is testimony from Maynard Cross that the day after the murder appellant showed Cross Holder's penis, located in the bushes outside appellant's house. Appellant claims that the admission of testimony related to these two instances created such hostility toward him that it led the jury to want to impose the maximum penalty, depriving him of a fair trial.

■ Evidence that appellant showed Holder's dismembered penis to Cross the day after the murder is probative of the appellant's state of mind toward the victim and is circumstantial evidence of premeditation. Likewise, evidence of the appellant's shaking of the victim's dismembered hand and corresponding comment, while potentially prejudicial, is indicative of appellant's disrespect for his victim, and relates to motive, intent to kill, and premeditation. The district court is in the best position to determine whether the prejudicial effect of the evidence substantially outweighs its probative value, and we hold that the district court did not abuse its discretion by admitting the challenged evidence.

II.

We turn to the question of whether appellant was denied his right to a fair trial by the admission of evidence of his prior convictions. The state sought to introduce three prior convictions to impeach the appellant's testimony at trial: a 1994 fourth-

degree assault conviction, a 1995 first-degree criminal sexual conduct conviction, and a 1995 conviction of fourth-degree possession with intent to sell a controlled substance. The district court did not allow admission of the 1994 assault conviction because it was stale and so similar to the charged offense that it would be error to admit it. The court allowed the other two convictions under *Jones* because they tended to "show the whole person" and "credibility is an important factor."

 Appellant alleges the district court did not fully analyze the admissibility of his prior convictions for impeachment under *Jones* and should have determined under Minn. R. Evid. 609(a)(1) that the prejudicial effect of admitting the convictions outweighed the probative value of the evidence. We review a district court's decision to admit evidence of a witness's prior convictions for an abuse of discretion. *State v. Gassler*, 505 N.W.2d 62, 67 (Minn. 1993).

 Evidence of a witness's prior felony convictions may be admitted if "the court determines that the probative value of admitting this evidence outweighs its prejudicial effect." Minn. R. Evid. 609(a)(1). In order to determine the probative value of past convictions, the court is to consider the five factors set forth in *Jones:*

> (1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the charged crime (the greater the similarity, the greater the reason for not permitting use of the prior crime to impeach), (4) the importance of defendant's testimony, and (5) the centrality of the credibility issue.

271 N.W.2d at 538.

The district court found that all five *Jones* factors were satisfied. The court considered the first factor as indicated by the court's "whole person" analysis. *See Gassler*, 505 N.W.2d at 67 (stating that impeachment by prior crime allows the jury to see the "whole person" and better judge the truth of his or her testimony). Second, in ruling that the 1994 assault conviction was stale, the court was impliedly ruling that the two later convictions were not stale. In addition, the court was cognizant of the fact that appellant had been in prison for "most of the time" since his 1995 convictions; appellant was still on parole for the 1995 offense when he committed the murder in this case. *See State v. Ford*, 381 N.W.2d 30, 33 (admitting an eight-year-old burglary conviction for impeachment upheld where defendant had spent four of those years incarcerated). Third, the court specifically evaluated the similarity of the 1994 offense and determined it was too "close to the present offense." The court admitted the 1995 convictions and, although not expressly stated, it is fair to surmise the court determined the conviction of possession with intent to sell a controlled substance and the conviction of first-degree criminal sexual conduct were not so similar to the crime of murder as to unfairly prejudice appellant. Finally, in stating that "credibility is an important factor," the court found appellant's testimony and credibility would be important, satisfying the fourth and fifth factors under *Jones*. *See State v. Ihnot*, 575 N.W.2d 581, 587 (Minn.1998) (holding that fourth and fifth *Jones* factors were satisfied where the defendant's credibility would have been a central issue in the case).

 The district court properly considered the *Jones* factors and therefore we conclude that appellant was not denied his right to a fair trial by the admission of evidence of his prior convictions.

### III.

Appellant claims there is insufficient evidence to support his conviction for premeditated first-degree murder because evidence of premeditation was based solely on the uncorroborated testimony of accomplices Chaka and Ramon Smith. We review insufficiency of evidence claims by viewing the evidence in the light most favorable to the verdict and assume the jury believed the state's witnesses and disbelieved everything that contradicted their testimony. *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980).

In this case, accomplice testimony was offered to establish that appellant premeditated Holder's death. As stated above, premeditation is a state of mind. *Johnson*, 616 N.W.2d at 726. "A state of mind generally is proved circumstantially, by inference from words and acts of the actor both before and after the incident." *Id.* However, a conviction cannot be based on the uncorroborated testimony of an accomplice. *State v. Pederson*, 614 N.W.2d 724, 732 (Minn.2000) (stating that accomplice testimony is "'inherently untrustworthy and must be supported by independent evidence'") (quoting *State v. Bergeron*, 452 N.W.2d 918, 924 (Minn. 1990)). Corroborating evidence is sufficient where it "reinforces the truth of the accomplice's testimony and points to the defendant's guilt in some substantial degree." *State v. Bowles*, 530 N.W.2d 521, 532 (Minn.1995). "It is not necessary that [an accomplice's] testimony be corroborated on every point or element of the crime." *State v. Lemire*, 315 N.W.2d 606, 610 (Minn.1982). Corroborating evidence may be either circumstantial or direct. *Pederson*, 614 N.W.2d at 732. "All inconsistencies in the evidence are resolved in favor of the state." *State v. Pippitt*, 645 N.W.2d 87, 93 (Minn.2002). Thus, the issue for this court to decide is whether the evidence introduced at trial, when viewed in the light most favorable to the verdict, is sufficient to corroborate the testimony of the accomplices and supports an inference that the appellant acted with premeditation.

A review of the record reveals that Chaka and Ramon Smith's testimony with respect to premeditation was corroborated by the following: Parker's testimony that Holder's body was dismembered and hidden, which may be considered circumstantial evidence of the appellant's state of mind; Cross's testimony that appellant showed him Holder's penis in the bushes outside appellant's house and made self-incriminating statements about killing, robbing, and dismembering Holder; evidence from the autopsy, including the two bullet holes, one in Holder's flank and the other in the neck; and Katrina Valley's testimony that appellant directed Leja to tell Holder to come to appellant's house while appellant was not home. The corroborating evidence of premeditation reinforced the truth of the testimony of Chaka and Ramon Smith and implicated appellant to a substantial degree. Therefore, we conclude that sufficient corroborating evidence was admitted to support the conviction for first-degree premeditated murder.

### IV.

Appellant also claims that the evidence is insufficient to support the conviction for first-degree murder while committing kidnapping because the confinement associated with the kidnapping was momentary and completely incidental to the murder. We agree and reverse appellant's conviction for first-degree murder while committing kidnapping.

We review insufficiency of evidence claims by viewing the evidence in the light most favorable to the verdict and assume the jury believed the state's witnesses and

disbelieved everything that contradicted their testimony. *Wahlberg,* 296 N.W.2d at 411.

We first enunciated the scope of confinement or removal necessary to support a kidnapping conviction in *State v. Morris,* 281 Minn. 119, 160 N.W.2d 715 (1968). In *Morris,* the defendant attacked and beat the victim, then threatened to kill her if she continued to scream. *Id.* at 120, 160 N.W.2d at 716. The defendant pulled her to the top of a flight of stairs and forced her into a corner where he sexually assaulted her. *Id.* He then made her walk down a flight of stairs before being confronted by a police officer. *Id.* The defendant argued that the victim "was confined only for a brief period of some 5 minutes and removed for a distance of only 100 or 150 feet," and therefore the behavior was incidental to the indecent assault and was not intended by the legislature to constitute kidnapping. *Id.* at 121, 160 N.W.2d at 717. We acknowledged that the more severe punishment available for kidnapping might not be warranted by the entire behavioral incident but "we [could not] say as a matter of law that the legislature did not intend the limited confinement and restraint which occurred in [*Morris*] * * * to constitute the crime of kidnapping." *Id.* at 123–24, 160 N.W.2d at 718. We expressed our concern in *Morris* that the statutory penalty for kidnapping might be unduly harsh for some behavioral incidents and we reminded "the prosecutor, the court, and the correctional authorities" of their duty "to modify the charge, the sentence, or the period of confinement so that it will be commensurate with the gravity of the crime and the harm or potential harm which is inflicted by the defendant." *Id.* at 124, 160 N.W.2d at 718. Importantly, we also noted that because the statute in force at the time permitted punishment only for the most serious crime resulting from one behavioral incident, the defendant was only sentenced for the kidnapping and not for the indecent assault. *Id.*

A decade and a half later, in 1983, the legislature passed statutory changes that allowed separate punishments for kidnapping and the offense facilitated by the kidnapping, thereby altering the effect of a kidnapping conviction. Act of May 12, 1983, ch. 139, § 2, 1983 Minn. Laws 378, 378–79 (codified at Minn.Stat. § 609.251 (1984)).

Following that statutory change in sentencing, we decided *State v. Crocker,* 409 N.W.2d 840, 842 (Minn.1987), a case in which the victim was moved from the living room into an adjacent bedroom before she was raped. We held that the defendant's actions constituted sufficient evidence of "confinement" or "removal" of the victim for the distinct offense of kidnapping. *Id.* at 845. But we expanded on our concerns in *Morris* by stating that

> [h]ad it not been for subsequent action by the Sentencing Guidelines Commission, there might be an argument in favor of re-examining *Morris,* because the combination of the *Morris* holding and the 1983 legislation seems to allow unfair exaggeration of the criminality of a defendant's conduct *in those cases where the confinement was completely incidental to the crime committed during the course of the kidnapping.*

*Id.* (emphasis added). We went on to note that any multiple sentencing was presumed concurrent under the sentencing guidelines and that when multiple sentences were imposed, only one criminal history point was assigned. *Id.* Thus, "although multiple sentencing is now permitted in this situation, the change is minimal in practical effect." *Id.*

Five years later, we decided *Dunn v. State,* 486 N.W.2d 428 (Minn.1992), a case in which the defendant was convicted of

confining the victim to facilitate commission of aggravated robbery. Based on evidence that the defendant held down the victim during the commission of an aggravated robbery, we upheld the kidnapping conviction because in *Morris* and *Crocker* we had previously "upheld convictions based on only small degrees of confinement or movement." *Id.* at 432. As in *Crocker*, punishment for the kidnapping was presumed concurrent and although multiple sentencing was permitted, the practical effect was that the defendant would not serve a separate sentence for kidnapping.

Since *Dunn*, the legislature has made several statutory changes that alter the practical effect of a kidnapping conviction. The statutory change relevant to this appeal is the enactment in 1998 of Minn.Stat. § 609.106, subd. 2(2) (2002), which provides that a person convicted of committing first-degree murder in the course of a kidnapping under section 609.185, clause (3), shall be sentenced to life without possibility of release.[1] Act of Apr. 6, 1998, ch. 367, § 6, 1998 Minn. Laws 666, 689. By passing Minn.Stat. § 609.106, the legislature created a distinction between different types of first-degree murders, and foreclosed any opportunity of release to those convicted for certain types of murders.

We have recognized that this statutory change results in "a significantly different implication to a kidnapping conviction" and that the recent legislation might provide "a basis on which we might re-evaluate our holdings in *Morris* and *Crocker*." *State v. Budreau*, 641 N.W.2d 919, 930 (Minn. 2002). We declined to do so in *Budreau* because the evidence did not raise concerns about "the possibility of unfair exaggeration of the criminality of [the] defendant's conduct." *Id.*

██ Because a conviction for the crime of kidnapping now carries with it significant consequences not present at the time of decision in either *Morris, Crocker,* or *Dunn*, fairness requires us to revisit and clarify our holding in those cases. We believe that confinement or removal must be criminally significant in the sense of being more than merely incidental to the underlying crime, in order to justify a separate criminal sentence. Under our current sentencing scheme, convictions that solely rely on acts incidental to the commission of one crime—here confining Holder in the course of murder—to constitute the elements of kidnapping (confinement) unduly exaggerate the criminality of the conduct. We conclude that where the confinement or removal of the victim is completely incidental to the perpetration of a separate felony, it does not constitute kidnapping.[2]

██ When we view the evidence in the light most favorable to the verdict, as we must, Holder was confined only momentarily when Chaka Smith blocked the door-

---

1. The passage of Minn.Stat. § 609.035, subd. 6, in 2000 also causes us to revisit our holding in *Morris* and *Crocker*. This statute provides that a conviction for committing first- through fourth-degree criminal sexual conduct "with force or violence" does not bar punishment for a crime committed as part of the same conduct and provides that consecutive sentences may be imposed without departing from the sentencing guidelines. Act of Apr. 3, 2000, ch. 311, § 1, 2000 Minn. Laws 185, 211. The Sentencing Guidelines have also

been amended to embody this change. Minn. Sent. Guidelines II.F.

2. With this decision, Minnesota joins the majority of states to hold that confinement or removal completely incidental to the commission of a separate felony does not amount to kidnapping. *See* 3 Wayne R. LaFave, *Substantive Criminal Law*, §§ 18.1(b) and (c) at 11–19 (2d ed.2003).

way and that confinement occurred only after the attack that culminated in Holder's murder was underway. The momentary blocking of the doorway was completely incidental to the murder for which appellant was convicted and, therefore, we conclude that there is insufficient evidence of confinement to support appellant's conviction for first-degree murder while committing kidnapping.

## V.

Appellant was sentenced to life without the possibility of release because he was found guilty of first-degree premeditated murder and the court determined he had a previous conviction for a heinous crime. He seeks modification of the sentence to allow for release consideration, claiming there was insufficient proof he had committed a heinous crime. Additionally, he asserts that under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *State v. Grossman*, 636 N.W.2d 545 (Minn.2001), whether he had a prior conviction for a heinous crime should have been submitted to the grand jury, proven at trial, and found by the petit jury beyond a reasonable doubt. We first consider whether *Apprendi* is implicated in this case.

In *Apprendi*, the Supreme Court held, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory *maximum* must be submitted to the jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added). The Supreme Court later held that its ruling in *Apprendi* did not preclude a judge from making a factual determination affecting the *minimum* sentence. *Harris v. United States*, 536 U.S. 545, 567, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (holding that "[w]ithin the range author-ized by the jury's verdict" the judge may require a defendant to serve a minimum term after the judge "make[s] certain factual findings").

The minimum term of imprisonment for first-degree premeditated murder is 30 years. Minn.Stat. § 244.05, subd. 4 (2002). By enacting Minn.Stat. § 609.106, subd. 2 (requiring a sentence of life without the possibility of release if defendant has previous conviction for a heinous crime), the legislature created a mandatory sentence that raised the *minimum* sentence from life in prison with the possibility of release after 30 years to life in prison without the possibility of release. The *maximum* term of imprisonment, however, was not increased under the statute. A defendant sentenced to life without the possibility of parole has the same statutory maximum; i.e., the sentence ends at the end of the defendant's life. We conclude the constitutional protections articulated in *Apprendi* are not implicated in this case because only the minimum term of imprisonment is affected by a finding of a heinous crime and, therefore, the determination of a prior heinous crime may be found by the court.

We next consider whether the district court properly found that appellant had a previous heinous crime conviction. According to the statute, the court shall "determine[] on the record at the time of sentencing that the person has one or more previous convictions for a heinous crime." Minn.Stat. § 609.106, subd. 2(3). A "heinous crime" is criminal sexual conduct in the first, second, or third degree, if the offense was committed with force or violence. Minn.Stat. § 609.106, subd. 1(3) (2002). Neither force nor violence is defined in the heinous crime statute but definitions are found under the criminal sexual

conduct code.[3] Under these definitions, coercion and force are not synonymous. A perpetrator may coerce a victim without using force. Moreover, coercion may be proven without "proof of a specific act or threat." Minn.Stat. § 609.341, subd. 14 (2002).

It is unclear how the district court in this case determined, based on the information before it, that the previous criminal sexual conduct conviction occurred "with force or violence." The court had before it only four items: the two judgments of conviction, the sentencing transcript, and the complaint. The complaint mirrors the statutory language alleging on the first-degree charge that appellant, age 19, engaged in sexual penetration of a minor, age 12. Minn.Stat. § 609.342, subd. 1(a) (2002). On the third-degree charge, the complaint again mirrors the language of the statute, alleging appellant used "force or coercion" to accomplish sexual penetration of the victim. Minn.Stat. § 609.344, subd. 1(c) (2002). Because the jury verdict in the 1995 criminal sexual conduct case could have been based on actions amounting to coercion but not rising to the level of force or violence, the 1995 judgments of conviction alone cannot form the basis for a finding that appel-

lant's previous criminal sexual conduct was perpetrated with "force or violence." [4]

■ The district court had the sentencing transcript, which references the trauma the 12–year–old victim suffered, the fact that the victim appeared fearful of appellant, and that appellant ejaculated in the victim's mouth, subjecting the victim to humiliation. We recognize that these comments from the presentence investigation, as relayed by the prosecutor in the sentencing hearing and the prosecutor's reference to the facts in the case relating to the humiliation suffered by the victim, may support an inference that appellant acted "with force or violence." Nonetheless, given the state of the law and the distinction between force and coercion, we must recognize the possibility that the statements could also be consistent with appellant having coerced the young victim, without a show of force or violence. Thus, the district court's finding that the previous crime occurred "with force or violence" is not sufficiently supported by the existing record. In order to determine whether the previous criminal sexual conduct for which appellant was convicted involved force or violence, the district court shall conduct a hearing to determine by a preponderance of the evidence whether the crime was

3. Minnesota Statutes § 609.341, subd. 3 (2002), provides:

"Force" means the infliction, attempted infliction, or threatened infliction by the actor of bodily harm or commission or threat of any other crime by the actor against the complainant or another, which (a) causes the complainant to reasonably believe that the actor has the present ability to execute the threat and (b) if the actor does not have a significant relationship to the complainant, also causes the complainant to submit.

Coercion is defined in subdivision 14 of that same section:

"Coercion" means words or circumstances that cause the complainant reasonably to fear that the actor will inflict bodily harm

upon, or hold in confinement, the complainant or another, or force the complainant to submit to sexual penetration or contact, but proof of coercion does not require proof of a specific act or threat.

4. Appellant claims that judgment of conviction should not have been entered for the 1995 third-degree criminal sexual conduct conviction because it is a lesser-included offense of the first-degree criminal sexual conduct offense. Whether the third-degree conviction was erroneously entered is moot because the district court may not rely solely on the mere fact of either conviction to support a finding that the crime was committed with "force or violence."

committed with "force or violence" as required by Minn.Stat. § 609.106, subd. 1(3). We remand to the district court for that purpose.

## VI.

We consider the matter of the restitution order. The district court, at the sentencing hearing, ordered appellant to pay restitution for Holder's funeral and burial expenses without itemizing the precise dollar amount of those expenses as required under Minn.Stat. § 611A.04, subd. 1 (2002). At the time of sentencing, Holder had not yet been buried because his mother wanted to recover all of his remains before the funeral and burial. On appeal, appellant claims he "has recently received notice that he is now subject to an order to pay restitution of a specific amount," and he demands the "notice-and-documentation procedure provided by [Minn.Stat. § 611A.04, subd. 1]." Appellant argues that without the information required by the statute, appellant could not request a hearing to dispute the restitution claims. Appellant requests that we direct the district court to stay the existing restitution order and to comply with the statutory procedures.

The state concedes that the order for restitution does not meet the requirements of Minn.Stat. § 611A.04, subd. 1, and that remand to the district court for documentation on funeral and burial expenses is appropriate.

The unusual circumstances surrounding this case prevented the district court from properly documenting the cost of funeral and burial expenses at the time of sentencing. Because Minn.Stat. § 611A.04, subd. 1, requires documentation of the amounts of claimed restitution and proper notice of the claim, we remand to the district court to properly document

the claimed expenses. *See State v. Ford,* 539 N.W.2d 214, 231 (Minn.1995).

## VII.

Appellant argues that the district court erred by sentencing him on both counts of conviction in violation of Minn.Stat. § 609.035. Because we reverse appellant's first-degree murder while committing kidnapping conviction for insufficiency of the evidence, appellant is now subject to punishment only on the first-degree premeditated murder conviction. The issue is moot and we decline to address it.

Affirmed in part, reversed in part, and remanded.

HANSON, Justice (concurring in part, dissenting in part).

I respectfully dissent from the reversal of Smith's conviction of first-degree murder while committing kidnapping. I read our prior caselaw to recognize these principles, that (1) the legislature has the exclusive authority to define crimes; (2) the legislature has defined the crime of kidnapping broadly, to include confinement or removal that is minimal and that may even be completely incidental to another facilitated offense; (3) the concerns of the court with the potential for prosecutorial abuse, by overcharging kidnapping to obtain undue punishment, cannot be addressed by changing the legislature's definition of the crime but only by exercising the court's supervisory powers to prevent sentences that "are unreasonable, inappropriate, excessive or unjustifiably disparate"; and (4) a prosecutor is free to prosecute under any statute that a defendant violates so long as the prosecutor's exercise of discretion is not discriminatory. These principles are necessary to maintain the separation of powers between the legislature, the court and the prosecutor.

The process by which I arrive at these conclusions is as follows:

1. The legislature has the "exclusive authority to define crimes and offenses and the range of the sentences or punishments for their violation." Minn.Stat. § 609.095(a) (2002). In *State v. Morris*, 281 Minn. 119, 123, 160 N.W.2d 715, 718 (1968), we recognized that the legislature's definition of kidnapping was deliberately broadened to include "limited confinement and restraint." In fact, *Morris* noted that the legislature "omitted any qualification as to time or distance" when it rejected the proposed language contained in the American Law Institute's Model Penal Code, § 212.1, which defined kidnapping to require removal for "a substantial distance" or confinement for a "substantial period." *Id.* at 122, 160 N.W.2d at 717. The *Morris* court specifically rejected the view of the New York court that removal or confinement that was incidental to another crime could not support a conviction for kidnapping. *Id.* at 123, 160 N.W.2d at 718 (citing *People v. Levy*, 15 N.Y.2d 159, 256 N.Y.S.2d 793, 204 N.E.2d 842 (N.Y.1965)). Instead, the *Morris* court followed the rule in New Jersey, Arizona and California, that a conviction of kidnapping may be sustained even though the kidnapping was incidental to the other crimes. *Id.* (citing *State v. Johnson*, 67 N.J.Super. 414, 170 A.2d 830 (N.J.Super.1961); *State v. Jacobs*, 93 Ariz. 336, 380 P.2d 998 (1963); *People v. Chessman*, 38 Cal.2d 166, 238 P.2d 1001 (1952), *overruled in part by People v. Daniels*, 71 Cal.2d 1119, 80 Cal. Rptr. 897, 459 P.2d 225, 238 (1969)).

In reaching this conclusion, the *Morris* court recognized that the court's concern should be focused on the resulting punishment and the court should act when the punishment is unduly harsh. *Id.* The court noted that the statute permitted punishment only for the most serious crime resulting from a single behavioral incident (citing Minn.Stat. § 609.035 (1968)) and approved the 20–year sentence that was based solely on the kidnapping conviction, not the indecent assault conviction. *Id.*

2. Between *Morris* and *State v. Crocker*, 409 N.W.2d 840 (Minn.1987), the legislature amended Minn.Stat. § 609.035 to provide that a conviction of the crime of kidnapping is specifically excepted from the prohibition against double punishment for a single behavioral incident. Act of May 12, 1983, ch. 139, § 1, 1983 Minn. Laws 378, 378–79. Thereafter, the court of appeals decided that a conviction of kidnapping was supported even though the removal or confinement was connected with the commission of another crime, in that case, rape. *State v. Dooley*, 380 N.W.2d 582, 585–86 (Minn.App.1986). In *Crocker*, we referred to our denial of a petition for review in *Dooley*, stating: "We saw no need then and see no need now to re-examine *Morris*." 409 N.W.2d at 845.

In *Crocker*, we reversed the holding of the court of appeals that removal and confinement that was completely incidental to a rape could not support a conviction for kidnapping. *Id.* We reinstated the kidnapping conviction, re-emphasizing that the "legislature chose not to use the language of Model Penal Code § 212.1"; that it was "not necessary under our statute to establish that the defendant confined his victim for a substantial period of time or removed her a substantial distance"; and that we had rejected the contention that it was unfair to sustain convictions of both kidnapping and indecent assault because the restraint "was only incidental to the sexual assault." *Id.* at 844.

*Crocker*, like *Morris*, suggests that the court's proper focus should be on the sentencing implications of the multiple convictions. *Id.* at 844–45. The court acknowl-

edged that although the 1983 amendment to section 609.035, authorizing separate sentences for kidnapping and the related crime, coupled with the *Morris* holding, might have allowed "unfair exaggeration of the criminality of a defendant's conduct in those cases where the confinement was completely incidental to the crime committed during the course of the kidnapping," that problem was avoided when the Minnesota Sentencing Guidelines were amended to provide that the multiple sentences would be concurrent. *Id.* at 845.

As to the concern that this result "gives prosecutors too much discretion," the *Crocker* court concluded that, under the constitution, a "state legislature is free to punish separately each step leading to the completion of a transaction and punish also the completed transaction" and that a prosecutor is "free to prosecute under any statute that a defendant violates provided that the prosecutor's exercise of his discretion does not violate the intent of the legislature and is not based on a discriminatory motive relating to race, religion or other arbitrary classification." *Id.* (citations omitted).

3. After *Crocker*, this court again addressed the argument that kidnapping cannot be supported by removal or confinement that is "an integral part" of another crime, in that case, robbery and murder. *Dunn v. State*, 486 N.W.2d 428, 432 (Minn. 1992). *In Dunn*, the removal and confinement were minimal and completely incidental to a robbery and murder; essentially, the evidence was that the appellant pinned the victim to the floor to accomplish the other crimes. We said:

> In this case, appellant was convicted of confining the victim to facilitate commission of aggravated robbery. That conviction is supported by the evidence. It does not matter that the confinement was an integral part of the robbery or

the murder. This court has found it "significant" that the legislature included no time or distance factors in the kidnapping statute and has upheld convictions based on only small degrees of confinement or movement. Based on the evidence in this case, the jury heard and saw ample evidence that appellant held down [the victim] during the commission of an aggravated robbery. That act would be sufficient to sustain a kidnapping conviction.

486 N.W.2d at 432 (citations omitted).

4. The evidence in the present case shows that the confinement of Holder was at least as extensive as the confinement of the victim in *Dunn*. Unless we are to overrule *Dunn*, we cannot fairly conclude that the evidence is insufficient to support the elements of kidnapping, as we have previously interpreted them. Appellant's role in the confinement was definitely "criminally significant in the sense of being more than incidental to the underlying crime." A fight, coupled with an assault with a flashlight, does not automatically cause a person to commit murder by shooting his gun twice. Appellant had to chase the victim around the room as the victim attempted to flee the dangerous situation and Chaka Smith physically blocked the victim's escape after the assaults, confining the victim by standing in the doorway and putting his hands on the walls. It was when this confinement occurred, and the victim was trapped, that the assault turned into a murder, and appellant had the time and the opportunity to shoot the victim at close range.

5. The legislature was on notice of our interpretation of its definition of the statutory elements of kidnapping in *Morris*, *Crocker* and *Dunn* and did not change the definition of those elements. This court does not have the authority to change the definition. The legislature's increase in

the maximum sentence for murder while committing kidnapping does not imply an intent to change the definition of the elements and likewise does not provide a logical basis to change our previous interpretation of the legislature's definition of those elements.

6. The decisions in *Morris, Crocker* and *Dunn* arose in situations where kidnapping was charged as a separate offense and the court was concerned with the possibility of multiple sentences arising from the same behavioral incident. That situation presents greater potential for abuse of prosecutorial discretion than in the present case, where kidnapping is only charged as an element of first-degree murder. In *Morris, Crocker* and *Dunn,* we were satisfied that we could address the potential of abuse by supervising the sentences. That remedy is also available in the present case, where the implication of including kidnapping as an element of the murder charge is to enhance the sentence for first-degree murder from one of life imprisonment with the possibility of release to one of life imprisonment without the possibility of release. We have the statutory authority to review a sentence "to determine whether the sentence is inconsistent with statutory requirements, unreasonable, inappropriate, excessive, unjustifiably disparate, or not warranted by the findings of fact issued by the district court." Minn. Stat. § 244.11, subd. 2(b) (2002). Smith does not argue that this sentence unduly exaggerates the criminality of his conduct or is otherwise unreasonable or excessive.

Having come to this conclusion, I would not address the sentence of Smith's conviction of first-degree premeditated murder because Smith can only be sentenced on one of the murder convictions and the conviction for murder while committing kidnapping provides a complete legal basis for that sentence. *See, e.g.,* Minn.Stat.

§ 609.035 (2002) (providing that a defendant can be sentenced for only one of the multiple offenses arising out of a single behavioral incident and providing an exception for kidnapping but not for murder while committing kidnapping).

GILBERT, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Hanson.